UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

VANESSA BOWLES,                )
                              )    Case No. 1:07CV2276
                              )
         Plaintiff,           )
                              )
    vs.                       )    JUDGE KATHLEEN O'MALLEY
                              )    (Magistrate Judge Mchargh)
CITY OF MANSFIELD,            )
         et al.,              )
                              )
         Defendants.          )    REPORT AND
                              )    RECOMMENDATION
                              )

McHARGH, Mag.J.

    The plaintiff Vanessa Bowles ("Bowles") has filed an action under 42 U.S.C. § 1983, alleging the improper execution of a nighttime search warrant, among other claims, against defendants City of Mansfield, Ohio; Richland County, Ohio; and other governmental entities and individuals.  The action arose from a nighttime police raid to enforce a search warrant for drugs and drug paraphernalia.  See generally doc. 49, Amended Complaint.

    Several of the defendants have filed motions for summary judgment.  The City of Ontario (hereinafter, "Ontario") has filed a motion for summary judgment on its own behalf.  (Doc. 78.)  Defendant Richland County ("Richland") has filed a

motion for summary judgment (doc. 79) as well, supported by a reply memorandum (doc. 114).   In addition, a motion for summary judgment (doc. 80) has been filed by the City of Mansfield ("Mansfield") and Mansfield Police Det. Steve Blust (collectively, "the Mansfield defendants"), also supported by a reply (doc. 117).

Also, defendants ASORT[1], City of Shelby ("Shelby"), Shelby Police Capt. Lance Combs ("Combs") and Sgt. David Mack ("Mack") have filed their own motion for judgment (doc. 82), as well as a reply (doc. 116).  Finally, defendant ASORT has filed a motion for summary judgment (doc. 81) on its own behalf, supported by a reply memorandum (doc. 115).

With leave of court (doc. 100), the plaintiffs have filed a single memorandum in opposition to these motions.  (Doc. 110.)

## I.  SUMMARY JUDGMENT

Summary judgment is appropriate where the entire record "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Non-moving parties may rest neither upon the mere allegations of their pleadings nor upon general allegations that issues of fact may exist.  See Bryant v. Commonwealth of Kentucky, 490 F.2d 1273, 1275 (6th Cir. 1974).  The Supreme Court has held that:

---

[1] ASORT stands for "Allied Special Operations Response Team," a tactical team formed by the Richland County Chiefs of Police Association.  (Doc. 81, brief, at 1.)  ASORT is sometimes cited by the parties as "A.S.O.R.T." but for consistency's sake, the court will use "ASORT."

2

> . . . Rule 56(c) mandates the entry of summary judgment, after adequate time
> for discovery and upon motion, against a party who fails to make a showing
> sufficient to establish the existence of an element essential to that party's
> case, and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The evidence need not be in a

form admissible at trial in order to avoid summary judgment, but Rule 56(e)

requires the opposing party:

> to go beyond the pleadings and by [his] own affidavits, or by the "depositions,
> answers to interrogatories, and admissions on file," designate "specific facts
> showing that there is a genuine issue for trial."

Id. at 324.

The Sixth Circuit in Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir.

1989), has interpreted Celotex and two related cases, Anderson v. Liberty Lobby,

Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co., Ltd. v. Zenith

Radio, 475 U.S. 574 (1986), as establishing a "new era" of favorable regard for

summary judgment motions.  Street points out that the movant has the initial

burden of showing "the absence of a genuine issue of material fact" as to an

essential element of the non-movant's case.  This burden may be met by pointing

out to the court that the respondent, having had sufficient opportunity for

discovery, has no evidence to support an essential element of his or her case.

Street, 886 F.2d at 1479.

The respondent cannot rely on the hope that the trier of fact will disbelieve

the movant's denial of a disputed fact, but must "present affirmative evidence in

order to defeat a properly supported motion for summary judgment."  Id.  In ruling

3

on a motion for summary judgment, the court must construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the party opposing the motion.  Kraus v. Sobel Corrugated Containers, Inc., 915 F.2d 227, 229 (6th Cir. 1990).

## II.  FACTUAL BACKGROUND

The following factual background is based primarily on plaintiff's factual recitation.  See generally doc. 110, at 2-9; see also doc. 49, Am. Compl., at ¶¶ 10-21. To the extent that it is based on evidence cited to the record, that evidence and any inferences drawn from that evidence, for the purposes of these motions for summary judgment, is construed in the light most favorable to Bowles, as the party opposing the motions.  Kraus, 915 F.2d at 229.

Vanessa Bowles is a lifelong resident of Mansfield, Ohio, who has lived at 325 Greenlawn Avenue for thirty-four years.  Bowles has been in a relationship with Myron Bowles, Sr. ("Myron") for thirty-two years, and they have three children: Rachel Reid ("Rachel"), Bryce Bowles ("Bryce"), and Myron Keith Bowles, Jr. (generally known as "Keith")[2].  (Doc. 110, at 2, internal footnotes omitted.)

In 2006, Bowles usually worked twelve hour days during the work week.  She worked at McElvain Group Homes from 10:00 a.m. to 2:00 p.m., and then at the

---

[2] For clarity, the court will follow the family's usage, and refer to Myron Bowles, Sr., as "Myron" and to Myron Keith Bowles, Jr., as "Keith."

Madison Local School District between 3:00 p.m. and 11:00 p.m.  Bowles has been employed by Madison Local Schools since 1985.  Id.

Bowles has a long history of cooperating with police and turning to them for assistance.  She has relied on police, probation, and parole officers to intervene when she felt Myron was endangering his life through the use of drugs.  On occasion, Bowles has monitored her husband's drug use by "playing parole officer," drug testing him because she wanted him to stay off illegal drugs.  During the execution of the search warrant the police found a drug testing kit in the house that Bowles asserts she was keeping for that purpose.  Id. at 2-3.

Bowles was also concerned about drug use in her neighborhood, and once called the police hotline to report that her neighbors and their children were on drugs.  Bowles believed she had a responsibility to monitor criminal activity and warned her husband, children and their friends not to bring any drugs to her house.  Bowles asserts that she did not know whether her son or husband used or sold any drugs from 325 Greenlawn Avenue.  Id. at 3.

In October 2006, Myron was incarcerated and not in the home.  Bowles and her son Bryce were the only people living in the house at 325 Greenlawn Ave.  Bryce was not accused of any illegal conduct.  Keith was no longer living at 325 Greenlawn Avenue.  He and his girlfriend moved out in approximately mid-September 2006.  Keith had removed his personal items and clothing from the house.  Id.

Defendant Mansfield Detective Steven Blust ("Blust") was the case agent and affiant for a search warrant signed by a Mansfield Municipal Court magistrate on October 9, 2006.  The search warrant was for narcotics and drug paraphernalia believed to be located at 325 Greenlawn Avenue. The warrant alleges that Keith sold drugs to a confidential informant on two occasions, five months before the search (May 4 and 5, 2006), at 177 Lexington Avenue and 325 Greenlawn Avenue. Id. at 3-4.

The search warrant traces Michael McCoy's involvement in drug trafficking back to 2003.  In 2006, McCoy allegedly sold drugs from several locations, including in and around 325 Greenlawn Avenue, 242 East First Street, 305 Home Avenue and the Knight's Inn Hotel (all in Mansfield).  On April 21, 2006, a tipster claimed that McCoy lived at 305 Home Street.  On or about September 7, 2006, informants made a controlled drug buy from McCoy at 242 East First Street.  The informant advised that McCoy was "possibly residing at a residence on Greenlawn Avenue."  On September 25, 2006, a tipster said McCoy used both 242 East Fifth Street and an unknown address on Greenlawn Avenue to distribute narcotics.  Id. at 4.

The warrant for 325 Greenlawn Ave. required the officers to "knock and announce" their presence, and authorized a nighttime entry because drugs could be easily destroyed.  The search warrant sought drugs and drug paraphernalia.  It is undisputed that no weapons were specifically sought by the warrant.  It is also clear that Vanessa Bowles was not wanted for violating any law.  Id.

6

On October 9, 2006, Bowles' daughter Rachel was visiting from Georgia. Rachel is a hairstylist.  When she visited Mansfield, she typically had clients come to 325 Greenlawn Avenue to get their hair done.  She was working out of the house for the three or four days preceding the service of the search warrant on October 10. Id.

Bowles did not work on October 9, 2006, because she had a dentist appointment.  She came home around 3:00 p.m., and several family members were at the house, including Rachel, Rachel's boyfriend Anthony Holland, and their son Chase, Bryce Bowles, Keith Bowles and Ms. Bowles' cousin, Charles Leach. Throughout the day, everyone gradually left the residence.  Bryce spent the night at a friend's house.  By the time Rachel left to return to Georgia at 10:30 p.m., Bowles was alone in the house.  She called her daughter every three hours to check on her because she worried when Rachel was on the road.  Bowles was afraid of staying home alone at night.  She did not go to bed until approximately 3:00 a.m. that night.  Id. at 5.

Defendant Blust alleged that McCoy lived at 325 Greenlawn.  Blust testified that someone had observed McCoy on the front porch with several other African-American males on October 9, 2006.   Blust had no idea who saw McCoy or when.  The officers alleged that a "lengthy investigation" concluded that McCoy had been at 325 Greenlawn on many occasions.  The warrant also lists other residences that were allegedly used by McCoy, including 242 East Fifth Street.  Id. at 5-6.

7

The warrant does not identify the time of day McCoy was observed at 325 Greenlawn Avenue, nor does it offer any other information suggesting that McCoy lived in the home or sold drugs from that location.  None of the informants who provided information for the warrant alleged that McCoy, or Keith, sold drugs from that location on October 9.  Id. at 6.

The Operational Plan for the execution of the warrant, which summarizes the intelligence and sets out a plan for ASORT's mission, did not reference Vanessa Bowles or Bryce Bowles. In fact, the Operational Plan states that it was "unknown if anyone else is staying there."  Bowles knew Michael McCoy because he grew up with her children and they attended church together.  Bowles did not know for sure if McCoy had had problems with drugs and the law, but she heard he was doing drugs.  She told McCoy not to do any drugs in her house.  Bowles later asked her family and friends who had been at the house that day if they saw Mr. McCoy on the porch on October 9. They told her they had not seen him.  Id.

ASORT is a tactical law enforcement unit made up of officers from the Richland County Sheriff's office and the cities of Mansfield, Shelby, Ontario and Lexington.[3]  The ASORT Defendants were asked to assist Defendant Blust in the execution of the warrant at the Bowles residence.  Id. at 6-7.

Defendant Lance Combs was the Commander of ASORT at the time of the raid.  Defendant Sgt. David Mack was the ASORT Team Leader for the mission.

---

[3] The City of Lexington did not participate in the warrant execution, and is not a defendant in this case.

8

Defendant Blust was also a member of ASORT.  Blust gave Mack a raid packet for the mission.  Blust drove Sgt. Mack by the residence so Mack could figure out the best approach for the ASORT Team.  Defendant Mack briefed the ASORT team at 5:00 a.m. on October 10, 2006, and they then deployed to 325 Greenlawn Avenue. Id. at 7.

Before going to bed, Bowles had not consumed any prescription or illegal drugs or alcohol.  She was asleep when the ASORT team approached her front door.  Suddenly, Bowles heard a loud explosion in the dark.  She jumped up from her bed because she knew it was something serious.  Id. at 7.  She said to herself:  "This might be it."  (Doc. 110, at 7; doc. 66, Bowles dep., at 72.)  Bowles was in mortal fear.  "I thought I was going to die.  I thought I was possibly being robbed.  I didn't know what was happening."  (Doc. 110, at 7; doc. 66, Bowles dep., at 72.)  She ran toward the noise.  At her bedroom door she saw a lot of smoke and light flashing, and people with masks on their faces, wearing all black and carrying guns.  The people in masks were in the hallway "yelling, screaming something about a search warrant."  (Doc. 110, at 7; doc. 66, Bowles dep., at 73.)

In fact, ASORT had forced the front door open using a battering ram and simultaneously thrown a flash-bang grenade into the hallway near Ms. Bowles' bedroom.  The ram damaged the front door and living room wall, and the grenade melted the carpet and singed the wall.  Bowles learned that they were police officers who were there to serve a search warrant.  They screamed at her to get down, and

9

one of the officers handcuffed her. Three or four guns were pressed against her head. (Doc. 110, at 7-8.)

The police officers asked her where McCoy was, and Ms. Bowles told them she didn't know. After approximately five minutes, she heard someone say "she's alone." The guns were removed from Bowles' head and she was led to the couch, where she remained handcuffed. During the search, the officers found a small quantity of marijuana and seeds in Keith's former bedroom. Id. at 8.

Det. Blust claimed that someone read the search warrant to Ms. Bowles and left a copy at the house. Bowles said no one showed her the search warrant on October 10, 2006. Id.

Lt. Sgambellone, METRICH Commander, arrived at the scene and asked Bowles where Myron was. Bowles, thinking they were referring to her husband, said he was incarcerated. When she asked him why the officers were in the house, he told her she was not cooperating with the police, so he would not answer her question about the search warrant. Lt. Sgambellone said he was going to send a truck out to take away her television. The officers flicked her hair out of her eyes while she was handcuffed, and someone said, "Isn't she cute today?" Id. at 8-9.

The raid on Vanessa Bowles' home was called "Operation Platinum" and it was executed in celebration of ASORT's anniversary. The local crime reporter arrived at the scene with Lt. Sgambellone, who had invited him to attend the execution of the warrant. Id. at 9.

10

Bowles was taken to jail and charged with possession of marijuana, drug paraphernalia and disorderly conduct.  She remained incarcerated for four to five hours.  Both drug charges were dropped after she took a drug test.  Bowles was charged with disorderly conduct for talking back to the officers.  She pled guilty to the fourth degree misdemeanor charges and paid a $50 fine.  However, a press release was published about Bowles' arrest describing the three charges against her.  Bowles was extremely upset when her name and arrest was revealed in newspaper coverage of the raid.  Id.

## III.  SECTION 1983

"The purpose of [42 U.S.C.] § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  Wyatt v. Cole, 504 U.S. 158, 161 (1992); McKnight v. Rees, 88 F.3d 417, 419 (6th Cir. 1996), aff'd, 512 U.S. 399 (1997) (quoting Wyatt).  To prove a claim under Section 1983, the plaintiff must identify a right secured by the Constitution or laws of the United States, and the deprivation of that right by a person acting under color of state law.  Searcy v. City of Dayton, 38 F.3d 282, 286 (6th Cir. 1994).  The threshold question, therefore, is whether the defendant deprived the plaintiff of a right secured by the Constitution or laws of the United States.  Kallstrom v. City of Columbus, 136 F.3d 1055, 1060 (6th Cir. 1998).

11

Bowles alleges a constitutional violation of "the right to due process of law and the right to be free of unreasonable searches and seizures" under the Fourth and Fourteenth Amendments to the U.S. Constitution.  (Doc. 49, Am. Compl., at ¶ 28.)  In particular, Bowles identifies the constitutional deprivation as an unreasonable seizure during the execution of the search warrant:

> . . . Ms. Bowles was unreasonably seized. The officers failed to adequately announce their presence. The officers failed to wait a reasonable time before forcing their entry into the home. And finally, the officers used excessive force after entry.

(Doc. 110, at 10.)

The Fourth Amendment requirement is that the police knock and announce their presence, then wait a reasonable time before a forced physical entry.  See, e.g., Wilson v. Arkansas, 514 U.S. 927, 936 (1995) (Fourth Amendment violation "if police officers enter without prior announcement"); United States v. Pinson, 321 F.3d 558, 565 (6th Cir.), cert. denied, 540 U.S. 912  (2003) (citing cases).

Claims of excessive force, as with other claims of unreasonable seizures, involve an alleged violation of the Fourth Amendment.  Graham v. Connor, 490 U.S. 386, 388 (1989); King v. Boyd, 194 F.3d 1312, 1999 WL 1024030, at *2 (6th Cir. 1999) (TABLE, text in WESTLAW), cert. denied, 530 U.S. 1265 (2000).  Claims that officers used excessive force are analyzed under the Fourth Amendment's "objective reasonableness" standard.  Brosseau v. Haugen, 543 U.S. 194, 197 (2004); Saucier v. Katz, 533 U.S. 194, 204 (2001); Graham, 490 U.S. at 394-95.  Determining whether the officer's actions were objectively reasonable "requires

careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest." Graham, 490 U.S. at 396; Russo v. City of Cincinnati, 953 F.2d 1036, 1044 (6th Cir. 1992). If the amount of force used to accomplish an arrest is objectively reasonable, then no constitutional violation occurred. Michaels v. City of Vermillion, 539 F.Supp.2d 975, 983-984 (N.D. Ohio 2008) (citing Baker v. City of Hamilton, 471 F.3d 601, 606 (6th Cir. 2006)).

## IV. LEGAL STATUS OF ASORT

The first issue to be resolved is the legal status of defendant ASORT. The amended complaint names ASORT as a "regional law enforcement organization made up of units of local government that belong to the Richland County Sheriffs Association." (Doc. 49, at ¶ 9.) ASORT has moved for summary judgment on the grounds that it "is not a legal entity capable of being sued." (Doc. 81, at 6.)

According to ASORT's brief in support of its motion for summary judgment, ASORT "is a tactical team, similar to S.W.A.T. that was formed by the Richland County Chiefs of Police Association[4] . . . in order to respond to tactical operations and high risk situations." (Doc. 81, brief in support, at 1.) RCCPA is "a private organization composed of the chief law enforcement officers for the Richland County

---

[4] The court will refer to this group as RCCPA, rather than "R.C.C.P.A."

Sheriff's Department, the Mansfield Police Department," and the police departments for the cities of Lexington, Ontario, Shelby, Belleville and Butler.  Id.

The status of ASORT is not consistently expressed by its co-defendants. According to co-defendant Richland County, ASORT is "a multi-jurisdictional police tactical team consisting of members from the Richland County Sheriff's Office and various police departments throughout Richland County." (Doc. 79, at 4.)  ASORT "responds to tactical and high risk search warrant situations."  Id.  ASORT's commander "reports to the Chiefs of Police Association Board which is made up of all the Chiefs of Police from the police departments within Richland County as well as the Sheriff of Richland County."  Id. at 3-4.

Co-defendant City of Mansfield says that ASORT is "a multi-jurisdictional task force through which officers from participating communities work in concert as a tactical team, similar to a SWAT team, to respond to high risk situations." (Doc. 80, at 5 n.2.)  And co-defendant City of Ontario characterizes ASORT as "a mutual aid arrangement consisting of Richland County police agencies and the Richland County Sheriff." (Doc. 78, at 3.)

A.  ASORT's Motion for Summary Judgment

In its motion, ASORT contends that it is not a legal entity capable of being sued. (Doc. 81, at 6.)  ASORT states that the members of the RCCPA did not intend to create a separate legal entity when ASORT was formed.  Id. at 7.  ASORT argues that it does not have its own operating budget, and that team members remain employees of their home law enforcement agencies, governed by the practices of

their home departments even when on ASORT assignment.  Each department remains responsible for the salary, equipment, training and discipline of its members.  Id. at 8.

ASORT points out that Ohio police departments have no independent legal status, but are merely sub-departments of the municipalities that operate them.  Id. at 8.  ASORT argues that subdivisions of governmental agencies are not entities capable of being sued.  Id. at 6.  However, ASORT does not contend that it is a subdivision of a governmental agency, nor does it contend that ASORT itself is a police department.  See doc. 81, brief in support, at 1.  Rather, ASORT states that it is a "tactical team," formed by RCCPA, which in turn is "a private organization" composed of local police chiefs and the county sheriff.  Id.

The ASORT Manual itself provides minimal assistance in this inquiry.  The Manual's definition of ASORT reads as follows:

> ASORT, (Allied Special Operations Response Team), was formed through the Richland County Association of Chiefs of Police (RCACP) consisting of all Richland County police agencies and the Richland County Sheriff.  ASORT personnel are drawn from various police agencies in Richland County.

(Doc. 96, exh. 4, ASORT Manual, at 1.)  The section concerning "organizational structure" states:

> ASORT was formed through the Richland County Chiefs Association. Therefore, decisions concerning ASORT shall be voted on by the Association.  A minimum of three (3) votes are required; (Example: Personnel guidelines, Standard Operating Procedures and Equipment).

Id. at 2.

15

Bowles responds that it is clear that ASORT is a "person" under Section 1983.[5]  (Doc. 110, at 32-34.)  Bowles points out that although states are not "persons" under Section 1983, local governments are considered "persons."  Id. at 32, citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989), and Berry v. City of Detroit, 25 F.3d 1342, 1345 (6th Cir. 1994), cert. denied, 513 U.S. 1111 (1995).  Not only municipalities, but also "other local government units" are included among those "persons" to whom Section 1983 applies.  Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 690 (1978). The Sixth Circuit has reasoned that, under Will , those entities which are not arms of the state should generally be considered "persons" for purposes of Section 1983. Alkire v. Irving, 330 F.3d 802, 812 n.7 (6th Cir. 2003).

Bowles contends that "ASORT is not incorporated, and is best described as an unincorporated association."  (Doc. 110, at 32.)  Bowles argues that ASORT should be considered "simply an unincorporated association of local governments."  Id. at

---

[5] Section 1983 provides as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

Will v. Michigan Dep't of State Police, 491 U.S. 58, 60 n.1 (1989) (quoting 42 U.S.C. § 1983).

33.  "ASORT is a group of governmental units that are acting together to provide tactical police services."  Id. at 34.  Bowles states that many types of local government entities have been held to be "persons," including those made up of multiple local governments.  Id. at 34.  In addition, ASORT should be considered an association, and associations are considered "persons."  Id.

Bowles notes that an unincorporated association may be sued under Civil Rule 17(b)(3).[6]  (Doc. 110, at 35, citing Fed. R. Civ. P. 17(b)(3).)  Civil Rule 17 governs the capacity to sue or be sued in federal court.  Fed. R. Civ. P. 17.  The capacity to sue or be sued for parties other than individuals or corporations is determined by the law of the state where the court is located, with two exceptions.  Fed. R. Civ. P. 17(b)(3).  The relevant exception here provides:

> a partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws.

Fed. R. Civ. P. 17(b)(3)(A).

Thus, under Rule 17(b), "in an action where a substantive federal right as distinguished from a right arising under local state law is involved, the capacity of an unincorporated association to sue or be sued will be governed by federal law."

---

[6] The State of Ohio has also departed from the common law norm, and permits an unincorporated association to sue or be sued "as an entity under the name by which it is commonly known and called."  Ohio Rev. Code § 1745.01; Tanner v. Columbus Lodge No. 11, Loyal Order of Moose, 44 Ohio St.2d 49, 50-51, 337 N.E.2d 625, 626 (1975).

Wilson & Co. v. United Packinghouse Workers of Am., 181 F.Supp. 809, 815 (D. Iowa 1960); see generally Fed. R. Civ. P. 17(b)(3)(A).

ASORT contends that Bowles must identify an Ohio statute that establishes ASORT as a separate legal entity.  (Doc. 115, at 3.)  ASORT argues that Ohio Rev. Code § 737.04 suggests that a multijurisdictional entity such as ASORT possesses no separate legal existence.  Id. at 3-4.  However, where "a federal substantive right is claimed, federal courts must apply federal and not state law in determining what constitutes an unincorporated association for capacity purposes."  Associated Students of Univ. of Cal. at Riverside v. Kleindienst, 60 F.R.D. 65, 67 (C.D. Cal. 1973) (citing cases).

An unincorporated association has been defined by federal courts as "a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective."  Id. (quoting Local 4076, United Steelworkers v. United Steelworkers, 327 F.Supp. 1400, 1403 (W.D. Pa.1971) (union local)).  See also Prewitt Enterprises, Inc. v. OPEC, 353 F.3d 916, 922 n.6 (11th Cir. 2003), cert. denied, 543 U.S. 814 (2004) (Organization of Petroleum Exporting Countries).  That definition seems apt here, and fairly describes the relationship of the various defendants.  See generally Matje v. Leis, 571 F.Supp. 918, 924 (S.D. Ohio 1983) ("Regional Enforcement Narcotics Unit" may properly be sued as unincorporated association).

Federal courts have found other voluntary associations involving governmental entities (although their purposes and activities differ from ASORT) to

18

be "persons" under Section 1983.  In Wright v. Arkansas Activities Ass'n, 501 F.2d 25, 27-28 (8th Cir. 1974), the Eighth Circuit found a voluntary association to be a "person" under Section 1983.  The association was not created by state statute or the state constitution, nor was it an agency of the state, but rather the association was established by local school systems on a voluntary basis.  The court found that the association was not immune from suit, and was a "person" under Section 1983. Wright, 501 F.2d at 28.

The Fifth Circuit, in Walsh v. Louisiana High School Athletic Ass'n, 616 F.2d 152, 156 (5th Cir. 1980), cert. denied, 449 U.S. 1124 (1981), came to the same conclusion.  The voluntary association in Walsh was not a regularly constituted agency of the state, nor was its existence provided for by statute or the state constitution, and the court concluded that the association was a "person" for purposes of Section 1983.  Walsh, 616 F.2d at 156.

In its reply, ASORT responds that the issue of whether ASORT is a "person" is not relevant to their argument that ASORT does not possess a "separate legal existence from the individual political subdivisions of which it is comprised."  (Doc. 115, at 1.)  On the contrary, the court finds ASORT is an unincorporated association which is amenable to suit.  Matje, 571 F.Supp. at 918; Associated Students, 60 F.R.D. at 67; Wilson, 181 F.Supp. at 815; Fed. R. Civ. P. 17(b)(3)(A).  Bowles argues that defendants have not identified any type of immunity, sovereign or otherwise, which would protect ASORT from suit.  (Doc. 110, at 34.)

19

ASORT argues in favor of a "general presumption that in the absence of a specific state statute mandating that the multijurisdictional task force was a separate entity, the Court was to look at the intent of the founders to determine whether or not they intended to create a separate legal entity." (Doc. 115, at 3, citing Timberlake v. Benton, 786 F.Supp. 676 (M.D. Tenn. 1992).)

In Timberlake, the district court did not apply a "general presumption." Rather, the court analyzed whether a local drug task force (the 19th Judicial District Drug Task Force), created pursuant to the Tennessee Code Annotated, was "a person subject to suit under 42 U.S.C. §1983." Timberlake, 786 F.Supp. at 682. The court recognized that courts have not been uniform in their approach to the meaning of "person." Id. The task force director argued that he was not amenable to suit in his official capacity since the task force was not a person subject to suit under Section 1983. Id.

The court noted that the task force resembled a police department, in the sense that it was comprised of police officers, and functioned to enforce the law. However, it was distinguishable from a police department in that:

> . . . the Task Force is not a department of any one city. It encompasses several counties and cities. It has a board of directors independent of any one city, and a unique source of funding. The authority for creation of the Task Force comes from two provisions of Tennessee law.

Timberlake, 786 F.Supp. at 682.

The Tennessee statute allowed two or more public agencies to enter into agreements for joint cooperation, and allowed the possibility of creating a separate

20

legal entity for this purpose.  Id.  Where no legal entity was created, the mutual aid agreement was required to provide for the manner of acquiring, holding, and disposing of real property.  Id. at 683 n.1.  Also, the parties to the agreement were required to form a joint board responsible for administering the task force.  Id. at 683 n.2.  Despite the organizational structure required by the Tennessee statute, the  court found that the provisions of the agreement at issue "tend to indicate that no distinct entity was created."  Id.  at 682.

The court in Timberlake pointed out that the state statute permitted cities and counties to enter into mutual aid agreements "without the creation of a separate legal entity."  Id. at 683.  The court "believe[d] that the creation of a legal entity capable of being sued should not be left to chance."  With that view, the court found that the task force was "a joint undertaking of several counties and cities and not a 'person' amenable to suit under § 1983."  Id.

This court is not persuaded by the reasoning of Timberlake.  The mutual aid agreement which led to the formation of the task force at issue can hardly be said to be the result of "chance."  The agreement included provisions for a Board of Directors, the acquiring, holding, and disposing of real property, and provisions for mutual indemnity.  While the task force may not have constituted a "separate legal entity" under Tennessee law, the task force's creation and existence was not a random or "chance" occurrence, but rather a deliberate action.

More importantly, the analysis of the task force's legal capacity to be sued in a federal Section 1983 action should have continued under Civil Rule 17, rather

than ending solely under Tennessee law.  Having found that the task force had no legal capacity to be sued under Tennessee law, the court should have gone on to apply federal law to determine if the task force was an unincorporated association capable of being sued.  Associated Students, 60 F.R.D. at 67; Wilson, 181 F.Supp. at 815; Fed. R. Civ. P. 17(b)(3)(A) ("other unincorporated association with no such capacity [to be sued] under that state's law may . . . be sued under its common name").

Another case cited by ASORT, Hervey v. Estes, 65 F.3d 784 (9th Cir. 1995), relied substantially on the incomplete analysis put forth in Timberlake.  See Hervey, 65 F.3d at 792 (citing Timberlake).  In Hervey, the plaintiffs sued the Tahoma Narcotics Enforcement Team (TNET) and other defendants, alleging excessive force during a "military-style raid" to search for a meth lab on rural property.  Id. at 786.  The court stated that "TNET is composed of several local, county, and state governmental entities," and that it "is not a municipality or local governmental entity, it is an intergovernmental association."  Id. at 791-792.

Relying on the flawed Timberlake analysis, the court stated that TNET "is only subject to suit if the parties that created TNET intended to create a separate legal entity."  Hervey, 65 F.3d at 792 (citing Timberlake, 786 F.Supp. at 682-688)[7].  The court noted that, under Washington law (and similar to the Tennessee law in

---

[7] Hervey also cites to Maltby v. Winston, 36 F.3d 548, 560 n.14 (7th Cir. 1994), which mentions Timberlake in passing.  Under Illinois law, the task force in question was subject to suit under state law (and thus implicitly under Fed. R. Civ. P. 17(b)(3)).

Timberlake), "public agencies entering into an agreement for joint or cooperative action may, but need not, establish a separate legal entity."  The court found that the TNET agreement did not contemplate a separate legal entity.  Id.  The court found that:

> The agreement creating TNET does not indicate from what authority it springs. Absent some indication from either state law or from the enabling document that anyone intended TNET to be a formal independent entity . . . we conclude that it is not an entity subject to suit under section 1983.

Hervey, 65 F.3d at 792.  Having determined TNET's lack of legal status under Washington state law, the court never proceeded to apply federal law under Civil Rule 17.

ASORT also cites Brown v. Fifth Judicial Dist. Drug Task Force, 255 F.3d 475 (8th Cir. 2001), and Eversole v. Steele, 59 F.3d 710, 716 n.6 (7th Cir. 1995), in support of its arguments.  (Doc. 81, at 6.)  In Brown, the court of appeals held that the district court's dismissal of a case against a drug task force, on the basis that it was not a legal entity capable of being sued, was not plain error.  Brown, 255 F.3d at 476.  The court found plaintiff's argument that the task force was an unincorporated association "plausible" under Rule 17, id. at 477, but found no "plain error" in the district court's ruling.  In its plain error analysis, the court cited Eversole and Hervey, among others, which found that similar drug task forces were not separate legal entities subject to suit.  Id. at 477.  The court in Brown concluded that "it seems to us that the District Court committed no error.  In any case, the error, if there was one, is certainly not 'plain.'"  Id. at 478.

Hervey, and its reliance on Timberlake, has already been discussed.  Eversole provides even shakier support for the conclusion at issue.  The court in Eversole was discussing the issue of whether certain individual defendants possessed final policymaking authority.  Eversole, 59 F.3d at 715-716.  During this discussion, in the footnote cited by ASORT, the court simply states that the drug task force "was not an official entity."  Id. at 716 n.6.

Whether considered a "joint undertaking," Timberlake, 786 F.Supp. at 683, or "an intergovernmental association," Hervey, 65 F.3d at 792, the task forces in those cases would certainly appear to be the type of "other local government units to be included among those persons to whom § 1983 applies."  Monell, 436 U.S. at 690.  Having found that they had no legal capacity to be sued under state law, Federal Civil Rule 17(b)(3)(A) would then apply, and a determination whether the task force was an unincorporated association capable of being sued should have followed.

In the case before this court, the formation and purpose of ASORT, and the structure and composition of ASORT and its teams, was not "left to chance."  A structure and Manual were put into place to govern the composition and procedures of ASORT and its teams.  (Doc. 96, exh. 4, ASORT Manual, at 1.)  Similarly, the decision to deploy ASORT to serve the search warrant, and the composition, role, and procedures of the ASORT team which served the warrant were not random events, but deliberate choices, guided by ASORT policies.  The ASORT team which served the warrant was a pre-existing group (with two additions from the other ASORT team), organized in advance for the very purpose of serving warrants, not a

24

random group of police officers from different jurisdictions spontaneously composed for mutual assistance, for example, to respond to an unexpected disaster or riot. Under these circumstances, the fact that ASORT may not exist as a "legal entity" under Ohio law does not serve to provide ASORT with a de facto immunity from federal suit under Section 1983.

The court is not persuaded by defendants' argument that it should be determinative that they did not intend to create a separate legal entity in forming ASORT.  The court notes that there are a number of other situations where the law determines the legal status of some group by their actions, such as, conspiracy (in the criminal realm) or partnership (in the civil).  For example, whether or not partnership exists may be determined by the intent of the parties to do things which constitute a partnership, and what they choose to call it is not legally determinative.  See, e.g. Derickson v. U.S. Dep't of Agriculture, 546 F.3d 335, 341-342 (6th Cir. 2008) (partnership can be implied); Ruggles v. Buckley, 158 F. 950, 954 (6th Cir. 1908).

For the reasons discussed more fully earlier, the court finds that ASORT is an unincorporated association which is amenable to suit under federal law.  Matje, 571 F.Supp. at 918; Associated Students, 60 F.R.D. at 67; Wilson, 181 F.Supp. at 815; Fed. R. Civ. P. 17(b)(3)(A).  For purposes of Section 1983, then, the court finds ASORT is a "person" which may be sued under Section 1983.  ASORT's motion for summary judgment (doc. 81) should be DENIED, because it has failed to demonstrate that it is entitled to judgment as a matter of law.

25

## V.  MUNICIPAL LIABILITY

The defendants include the Cities of Mansfield, Ontario, and Shelby, as well as the County of Richland, Ohio.  (Doc. 49, at ¶¶ 4-5.)

Before a municipality can be held liable under Section 1983, the plaintiffs must show that their alleged injuries were the result of some "policy or custom" attributable to the municipality.  Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995); Leach v. Shelby County Sheriff, 891 F.2d 1241, 1245 (6th Cir. 1989), cert. denied, 495 U.S. 932 (1990) (quoting Monell, 436 U.S. at 690).  An official policy "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  Monell, 436 U.S. at 690. Thus, before a municipality can be held liable under Section 1983, a plaintiff must show that his injuries were the result of some "policy or custom" attributable to the city.  Vann, 72 F.3d at 1049; Leach, 891 F.2d at 1245 (quoting Monell, 436 U.S. at 690).

Under Monell, a municipality is liable only where its policies are the "moving force" behind the alleged constitutional violation.  City of Canton v. Harris, 489 U.S. 378, 389 (1989) (quoting Monell, 436 U.S. at 694).  The plaintiffs cannot base their claims against a city solely on the police officers' conduct, because respondeat superior is not available as a theory of recovery under section 1983.  Monell, 436 U.S. at 691.

Although cases applying Monell most often discuss "municipalities," Ohio counties lack sovereign immunity, and are not considered arms of the State of Ohio.

26

S.J. v. Hamilton County, Ohio, 374 F.3d 416, 419-420 (6th Cir. 2004).  Thus,

Richland County does not have (nor does it assert) sovereign immunity, and is

subject to a Monell analysis.  See generally Pembaur v. City of Cincinnati, 475 U.S.

469, 483-484 (1986) (Ohio county liable); Powers v. County of Lorain, No.

1:05CV1596, 2006 WL 2899896, at *3 (N.D. Ohio Oct. 9, 2006), aff'd, 2008 WL

162897 (6th Cir. 2008) (applying Monell); Simms v. Athens County Sheriff's Office,

No. 2:02CV1096, 2005 WL 2233232, at *10 (S.D. Ohio Sept. 14, 2005) (same).

The defendant City of Mansfield asserts that Bowles cannot establish an

unconstitutional policy or practice by the city which would enable her to recover

against Mansfield.  (Doc. 80, at 16-33.)  Mansfield argues that Bowles cannot

identify a Mansfield policy or practice which gave rise to an alleged constitutional

violation.  Id. at 21.  Mansfield also argues that there was no underlying

constitutional violation, because there was no violation of the knock-and-announce

standard, and the force used on Bowles was reasonable.  Id. at 26-33.

Richland County contends that there was no constitutional violation because

the ASORT team properly executed the search warrant.  (Doc. 79, at 9-11.)  Any use

of force was reasonable and appropriate under the circumstances.  Id. at 11-12.

Nonetheless, Richland argues that Bowles cannot point to any Richland County

policy or custom which was the cause of the alleged injuries.  Id. at 7-8.

The City of Shelby also contends that the claims against them fail as a

matter of law.  (Doc. 82, at 10-11.)  They argue that Bowles can show no official

policy from an official policymaker which was the moving force behind the alleged

violations.  Id. at 10.  Shelby argues that no constitutional violation occurred.  Id. at

5-11.  The defendant City of Ontario argues that Bowles cannot show that the city

has an official policy or practice which was the moving force behind the alleged

constitutional violation.  (Doc. 78, at 6.)


A.  Municipality Liability Through Actions of Final Policymakers

Bowles argues that each of the defendant local governments can be liable

under Section 1983 "based on one of three theories:  (1) the action was taken

pursuant to a formal policy; (2) the action was taken pursuant to a longstanding

practice or custom; and (3) the action was taken by a person serving as a 'final

policymaker.'"  (Doc. 110, at 39, citing Monell, 436 U.S. 658).  Here, Bowles

contends that the defendants "are bound by the actions taken at the direction of

final policy makers, ASORT Commander, Lance Combs and ASORT Team Leader,

David Mack, with respect to the execution of the search warrant at the Bowles

home."  Id.

The Supreme Court has concluded that Section 1983 cannot be interpreted to

incorporate doctrines of vicarious liability.  Pembaur, 475 U.S. at 479; Monell, 436

U.S. at 691.  Thus, for there to be municipal liability under Section 1983, liability

for wrongful conduct is limited to actions for which the city is actually responsible.

Pembaur, 475 U.S. at 479.  The Court noted  that "it is plain that municipal

liability may be imposed for a single decision by municipal policymakers under

28

appropriate circumstances." Id. at 480; see also Feliciano v. City of Cleveland, 988 F.2d 649, 655 (6th Cir.), cert. denied, 510 U.S. 826 (1993).

A plurality of the Court stated:

Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.  The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.  The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.  Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.

Pembaur, 475 U.S. at 481-483 (plurality opinion) (internal citations omitted).  The focus is on the "final policymaking authority" for "the action alleged to have caused the particular constitutional or statutory violation at issue." Jett v. Dallas Independent Sch. Dist., 491 U.S. 701, 737 (1989); see also City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (plurality opinion).

"Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials ." Feliciano, 988 F.2d at 655 (citing Praprotnik, 485 U.S. at 127 (plurality)).  Another consideration is "whether the employee . . . formulates plans for the implementation of broad goals." Miller v. Calhoun County, 408 F.3d 803, 814 (6th Cir. 2005).

A municipality is not liable merely because an official had authority to act on its behalf, rather, the official must have "final authority to establish municipal policy with respect to the [challenged] action." Praprotnik, 485 U.S. at 139 (Brennan, J., concurring) (quoting Pembaur, 475 U.S. at 481).  The distinction between the discretion to act and policymaking authority is important because municipal liability for an official's discretionary acts "would be 'indistinguishable' from respondeat superior liability." Feliciano, 988 F.2d at 656 (citing Praprotnik, 485 U.S. at 126).

Bowles contends that "the government entities that make up ASORT delegated to the ASORT commander and the team leaders unfettered discretion to direct the ASORT teams on operational missions." (Doc. 110, at 41.)  Bowles relies on the following deposition testimony, of Richland County Sheriff Sheldon, in support of that assertion:

> Q.  And once Captain Combs or Officers Miller or Mack determined how to deploy the ASORT team they don't have to go to any other bosses in any of the other departments to get approval for their plan, right?
>
> * * * * *
>
> A.  They're the tactical people.  They make that decision.
>
> Q.  As far as tactical policy goes, they're the top decision-makers, is that right?
>
> A.  That's correct.

(Doc. 110, at 41, quoting doc. 108, Sheldon dep., at 37-38.)

Bowles also refers to the deposition testimony of Mansfield Police Chief

Messer:

> Q.  And dealing with that individual incident who has the authority to determine the assignment of the personnel and the actual operation plan?
>
> A.  When you say assignment of personnel, specifically are you referring to ASORT members?
>
> Q.  Yes.
>
> A.  The commander or on-scene supervisor of the ASORT team.

(Doc. 110, at 42, quoting doc. 96, Messer dep., at 12.)

Bowles argues that this evidence shows that "unfettered discretion in

conducting ASORT operations" was delegated to ASORT leaders Combs and Mack.

(Doc. 110, at 42.)  Because the ASORT leaders "had authority to deploy ASORT

officers and develop operation plans and they did not need any additional approvals

to execute an operational plan," the court is urged to find that Combs and Mack

were policymakers for the governments involved.  Id.

Richland County responds that the ASORT leaders "had merely discretionary

authority over tactical operations of the ASORT team."  (Doc. 114, at 5, citing

Messer dep., at 14, 18.)  While ASORT leaders "may have made tactical decisions, . .

. they did not make final policy because they did not have final say on policy for the

ASORT team."  (Doc. 114, at 6.)

The Mansfield defendants point out that the deposition testimony cited by

Bowles "addresses only the authority of the ASORT commander and team leaders to

31

create an operational plan (including ASORT personnel assignments), or to go

forward with a raid, and whether the leaders have to clear those decisions in

advance with a supervisor." (Doc. 117, at 7.)  They contend that discretion over the

tactical aspects of law enforcement does not constitute policymaking authority for

Section 1983 purposes.  Id. at 9.  They assert Bowles has not demonstrated that

authority to make discretionary decisions over personnel or an operational plan

rises to the level of policymaking authority, where it has nothing to do with the

implementation of broad goals, and has no impact on the ongoing policy of the

municipality.  Id. at 10.

In his deposition, Mansfield Police Chief Messer had testified on the topic of

use-of-force policies:

> Q.  When an ASORT team is deployed and they use deadly force,
> whose policies are they following in the use of that deadly force?
>
> A.  Their home agency's policies each again reference to the manual
> refers you – it provides general guidelines in some areas, but it always
> refers you back to the home agency's policies.
>
> Q.  An ASORT team has multiple people on it; right?
>
> A.  That's correct.
>
> Q.  And typically the ASORT team will have representatives from
> different home agencies; right?
>
> A.  That's correct.
>
> Q.  What action is taken, if any, to ensure that the home agency policy
> with respect to the use of deadly force are compatible with each other
> so an ASORT team following various home agency policies can act as a
> team?

\* \* \* \* \*

A.  The manual lies [sic] or outlines minimum force policies including deadly force policies and then it says that further restrictions of a home agency which must be followed as well.  So there are general restrictions within the manual itself as to deadly force and other use of force procedures.

(Doc. 96, Messer dep., at 18-19.)

Beyond the portions quoted by Bowles, Sheriff Sheldon's deposition had continued on the topic of policy as follows:

Q. With respect to the Richland County Sheriff's Office employees who engaged in the execution of the search warrant at 2619 Park Avenue East did they follow all of the Richland County Sheriff's Office policies that were -- that applied to their work that night?

MR. DOWNEY: Objection. You can answer.

A. I believe so.

Q. And what policies would apply to a Richland County sheriff deputy working for ASORT at 2619 Park Avenue East?

MR. DOWNEY: Objection. You can answer.

A. Generally use of force or response and resistent [sic] policies, generally it's a matter of semantics, basically the same thing, but policies for each agency are generally very, very similar to one another and in compliance with the Ohio Revised Code.

(Doc. 108, Sheldon dep., at 38.)

Municipal liability attaches only where the officer in question possesses final authority to establish municipal policy with respect to the action ordered.

Pembaur, 475 U.S. at 481.  Bowles has alleged that she was unreasonably seized, as

33

the officers failed to wait a reasonable time prior to forced entry, and the defendants used excessive force during the execution of the search warrant. (Doc. 110, at 10.)

Bowles points to the Messer and Sheldon depositions to argue that "unfettered discretion in conducting ASORT operations" was delegated to ASORT leaders Combs and Mack. (Doc. 110, at 42.) They claim the testimony demonstrates that the ASORT leaders "had authority to deploy ASORT officers and develop operation plans" without specific approval. Id.

The court agrees with the defendants that the evidence put forward by Bowles concerns tactical discretion, that is, methods or procedures used for short-range objectives, rather than authority relating to long-term policy considerations. More importantly, Bowles has offered no evidence that Combs or Mack had any input whatsoever on the relevant knock-and-announce or use-of-force policies. See generally doc. 96, Messer dep., at 18-19; doc. 108, Sheldon dep., at 38.

The court cannot find, on the basis of the evidence offered by Bowles, that Combs and Mack were "final policymakers" for the governments involved.

## B. Municipality Liability Through Unconstitutional Policy

Bowles argues that contested material facts preclude summary judgment regarding the defendants' "policy of proceeding with a raid in a manner that for[e]seeably prevents a resident from hearing the knock and announce and causes forced entry into the home without waiting a reasonable time." (Doc. 110, at 43.) Bowles contends that the policies set by ASORT policymakers caused her not to

34

learn that police were at her door, and caused her to be subjected to a forced entry.
"These policies were the moving force behind the unreasonable seizure and
excessive force in this case." Id.

Bowles claims that Combs, as ASORT Commander, set policy for ASORT,
and was responsible for all training. Id. at 44. "As the lead policymaker for
ASORT, Defendant Combs was responsible for ensuring that defendants adequately
announced their presence." Id. Bowles states that ASORT members were not
instructed to amplify their voices when announcing their presence. Id. at 44-45.

Combs acknowledged that ASORT must wait a reasonable time before
entering a residence, after the knock and announce is given, but he did not identify
a "baseline time for the team members," or define what a reasonable time would be.
Id. at 45.

Bowles asserts that Mack was the ASORT team leader for the search warrant
on her home. As such, he was "responsible for deciding when the ASORT Team has
actually or constructively been refused entry." Id. at 46. Mack testified that
ASORT does not decide how long to wait ahead of time, instead, the decision about
when to enter the home is made by the team leader at the door. Thus, Bowles
contends that Mack was responsible for the ASORT team's alleged failure to
adequately knock and announce. Id.

Bowles claims that the defendants "ignored nationally recognized protocols of
the service of knock-and-announce search warrants." Id. at 46. She states that
"ASORT Officers could not offer a baseline length of time they wait before making

35

forcible entry." Id. at 47.  However, the protocol referenced by her expert "simply states that officers must wait a reasonable period of time before making forced entry into a residence after they knock and announce." (Doc. 67, Lyman dep., at 29.)  The protocol, as testified to by her expert, does not require "a baseline length of time."  Nevertheless, the issue here is not whether the defendants followed "best practices," or "recognized protocols," but whether they deprived Bowles of a right secured by the Constitution or laws of the United States.  Kallstrom, 136 F.3d at 1060; Searcy, 38 F.3d at 286.  Bowles contends that "the ASORT defendants have a policy that sets no actual time limit for forcing entry." (Doc. 110, at 47.)

As mentioned earlier, the Fourth Amendment requirement is that the police knock and announce their presence, then wait a reasonable time before a forced physical entry.  See, e.g., Wilson, 514 U.S. at 936 (Fourth Amendment violation "if police officers enter without prior announcement"); Pinson, 321 F.3d at 565 (citing cases).  The testimony of Bowles' expert is in line with the case law:  "officers must wait a reasonable period of time before making forced entry into a residence after they knock and announce." (Doc. 67, Lyman dep., at 29.)

There is no constitutional requirement that the officers be heard or understood, so long as the announcement is loud enough to be audible.  See generally Brigham City, Utah v. Stuart, 547 U.S. 398, 406-407 (2006) (officer could not be heard above tumult within residence); United States v. Banks, 540 U.S. 31, 33 (2003) (resident was in shower and heard nothing until door breached); Pierce v. Burkart, No. 03-74250, 2005 WL 1862416, at *5 (E.D. Mich. Aug. 4, 2005)

("Testimony by occupants of the home that they did not hear the police knock and announce does not give rise to a reasonable inference that the police failed to do so and thus is insufficient to defeat summary judgment").  There is no constitutional requirement that a policy set forth a specific time limit for waiting after the knock-and-announce, and Bowles does not identify any case law setting forth such a requirement.

Bowles testified that she went to bed at 3:00 a.m. on the night in question. (Doc. 66, Bowles dep., at 66.)  She had been worried, waiting to hear from her daughter, to see if she had arrived in Georgia safely.  Id. at 67, 72.  After finally going to sleep, Bowles was awakened by a "loud explosion" some time after 6:00 a.m.[8]  Id. at 70-71.  She jumped up concerned for her life, fearing a burglary, and ran toward the noise.  Id. at 72.  In the hallway, she encountered the ASORT team, "yelling, screaming something about a search warrant."  Id. at 73.

The officers have testified that they knocked and announced, and after waiting an undetermined time[9], they forced entry.  See, e.g., doc. 93, Gouge dep., at 99-100, 102; doc. 86, Bammann dep., at 57.  The facts as presented in Bowles' testimony do not contradict the ASORT officers' testimony that they knocked and announced.  Rather, Bowles' testimony establishes that she was asleep prior to the

_____

[8] The police report identifies the time as 6:47 a.m.  (Doc. 66, Bowles dep., at 71.)

[9] Bowles suggests that a reasonable time under these circumstances would be 15-30 seconds.  (Doc. 110, at 14.)  Gouge estimated they waited as long as 60 seconds.  (Doc. 93, Gouge dep., at 102.)  Bowles cannot contradict this estimate.

entry, and thus cannot support any inference as to whether the team knocked and announced or not.  (Doc. 66, Bowles dep., at 70-72; doc. 112, Bowles decl., at ¶ 4.) Bowles relies on pure conjecture to argue that the officers did not knock, or did not wait long enough:

> 5.  I am not a heavy sleeper.  Had the officers knocked loudly and announced their presence I would have promptly exited my bed and looked through my front window to see who was at my door.  That would have taken me no more than 5 10 seconds.

> 6.  If I had seen the police on my front steps I would have opened the door.

(Doc. 112, Bowles decl., at ¶¶ 5-6.)

Bowles cites State v. King, 136 Ohio App.3d 377, 736 N.E.2d 921 (Ohio Ct. App. 1999), to support an argument that if a resident did not hear any announcement, the court can find that police did not properly identify themselves. However, the facts in King were rather different.  The entry was at 6:37 p.m., not in the early morning hours, and the defendant, a neighbor, and another third witness were all awake at the time of the entry.  King, 136 Ohio App.3d at 378-380, 736 N.E.2d at 922-924.  Here, Bowles was admittedly asleep at the relevant time.

In any event, Bowles emphasizes the specific circumstances of this case to establish the existence of an unconstitutional "policy."  The court has already determined that Combs and Mack were not "final policymakers" for the defendant governments.  Bowles cannot base her claim against the municipal defendants solely on the ASORT officers' conduct, because respondeat superior is not available as a theory of recovery under section 1983.  Monell, 436 U.S. at 691.

38

Municipalities are not liable under Section 1983 "unless action pursuant to official municipal policy" caused a constitutional violation.  Monell, 436 U.S. at 691. In other words, under Monell, a municipality is liable only where its policies are the "moving force" behind the constitutional violation.  Harris, 489 U.S. 378, 389 (1989) (quoting Monell, 436 U.S. at 694).  Bowles has failed to identify a specific unconstitutional policy of any governmental defendant which was the moving force behind the alleged constitutional violations.

### C.  Negative Inference for "Destruction of Records"

Bowles argues that the court should adopt a negative inference due to a destruction of records.  (Doc. 110, at 19-22.)  Bowles argues that "defendants were required to record the time they waited before entry and failed to do so."  Id. at 19. In support of this assertion, Bowles quotes the section of the ASORT Manual which pertains to the Team Leader's duties with regard to the preparation for the mission. The relevant section reads:

[VI. PERSONNEL ]

* * * * *

[B. Team Leaders ]

* * * * *

7.  Once ASORT has been requested, the team leader shall have the following duties completed before the team carries out a mission:

a.  Preparation for Mission:

* * * * *

(9) Execution of the mission must document the following:

        (a) Time of event
        (b) Time of entry
        (c) Time scene is secured
        (d) Time scene is turned over and to whom
        (e) Time team secures (Times must be approximate only)

(Doc. 96, exh. 4, ASORT Manual, at 15-19.)  The court notes there is no indication in the Manual that the team leader was "required to record the time they waited before entry."

Bowles also contends that she requested all records related to the warrant execution, but did not receive "any time records related to the search warrant." (Doc. 110, at 20.)  Bowles suggests that the court draw an adverse inference from the defendants' failure to present evidence, loss of evidence, or destruction of evidence.  Id. at 21.  The court should infer that the time records were destroyed or lost by defendants, and thus the court should infer that the records would have been unfavorable to the defendants.  Id. at 22.  In summary, Bowles argues that the court "should credit [her] version of events because the defendants failed to produce time records that would have supported her contention that they did not adequately knock and announce or wait a reasonable time for her to answer the door."  Id.

Defendants Shelby and ASORT respond that Bowles is not entitled to any negative inference with respect to the timing of the entry.  (Doc. 116, at 10-12.) They point out that Bowles has not satisfied the elements which she must prove to be entitled to that inference.  Id. at 11-12, citing Smith v. Howard Johnson Co., Inc.,

40

67 Ohio St.3d 28, 29, 615 N.E.2d 1037, 1038 (1993).  See also Owca v. Federal Ins. Co., No. 02-3981, 2004 WL 187558, at *3 (6th Cir. Jan 27, 2004) (citing Smith).

Ohio only recognizes a tort of intentional spoliation of evidence.  The following elements comprise the tort of intentional spoliation:

> (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of the defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of plaintiff's case, and (5) damages proximately caused by the defendant's acts.

Owca, 2004 WL 187558, at *3 (citing Smith); Bae v. Dragoo and Assoc., Inc., 156 Ohio App.3d 103, 112-113, 804 N.E.2d 1007, 1015 (Ohio Ct. App. 2004).  The defendants argue that Bowles "has failed to show any willful destruction of the evidence designed to disrupt the case or that any of these Defendants actually destroyed that evidence." (Doc. 116, at 11.)  The defendants maintain that there is no testimony or other evidence that the information Bowles seeks was actually recorded or kept.  Id. at 11-12.  They point out that claims of spoilation are limited to the destruction of physical evidence, and that Ohio courts have indicated that failing to create a record cannot form the basis for a spoilation claim.  Id. at 12.

In Brokamp v. Mercy Hosp. Anderson, the appellants argued that the trial court in a medical malpractice suit erred by not giving an instruction relating to negative inference.  Brokamp v. Mercy Hosp. Anderson, 132 Ohio App.3d 850, 869-870, 726 N.E.2d 594, 608-609 (Ohio Ct. App. 1999).  The court of appeals characterized their argument as "feckless," and ruled that the mere fact that a nurse did not chart the disputed site of a Demoral injection did not require such an

41

instruction.  Id.  The jury had found that the medical records were not intentionally altered or destroyed.

Keen v. Hardin Memorial Hospital also involved contested jury instructions in a medical malpractice case.  Keen v. Hardin Mem. Hosp., No. 6-03-08, 2003 WL 22939453 (Ohio Ct. App. Dec. 15, 2003).  The appellant argued that the trial court should have instructed the jury that it could infer that information contained in "missing" emergency room dictation would be harmful to the defense.  Keen, 2003 WL 22939453, at *3.  The appellate court noted that most cases involving successful spoilation claims involved evidence that "was somehow lost, altered, or destroyed by the party who had control of the evidence."  Id.  The court noted that, in the case before it, there was no evidence that the disputed material existed.  "Non-existent evidence, by its very nature, cannot be spoiled."  Keen, 2003 WL 22939453, at *4.

Ohio courts have not extended spoilation claims to anything other than the destruction of actual physical evidence.  Pratt v. Payne, 153 Ohio App.3d 450, 454-455, 794 N.E.2d 723, 726-727 (Ohio Ct. App.  2003) (citing cases).  Here, there is no indication whatsoever that the records sought by Bowles existed.  There can be no claim for spoilation, nor any negative inference in that regard.  See generally Cuttill v. Pickney, No. C2-04-375, 2005 WL 3216578, at *3-*4 (S.D. Ohio Nov. 28, 2005); Pratt, 153 Ohio App.3d at 454-455, 794 N.E.2d at 726-727; Keen, 2003 WL 22939453, at *4.  This court cannot adopt a negative inference on the basis of destruction of records because there is no evidence that such records existed.

42

In addition, other than internal ASORT policy, Bowles points to no obligation under federal or Ohio law for ASORT to maintain records of the exact time that they waited to enter after the knock-and-announce.  See generally doc. 110, at 18-22.

Bowles has failed to designate specific facts showing that there is a genuine issue for trial on the Monell issue.  The defendants' motions for summary judgment (doc. 78, 79, 80, and 82)  should be GRANTED on the issue of municipal liability.


## VI.  DOCTRINE OF QUALIFIED IMMUNITY

Several of the individual defendant officers have invoked the doctrine of qualified immunity in their motions for summary judgment.

Mansfield Police Det. Blust contends that he is entitled to qualified immunity from plaintiffs' claims.  (Doc. 80, at 15-16.)  He asserts that there is no evidence that Blust violated Bowles' constitutional rights.  Id. at 15.  His role with respect to the search was limited, in that he was outside the house (and did not actively participate) when the entry took place.  He was the affiant for the search warrant, and participated in the actual search of the house.  Id., citing doc. 80, DX C, Blust decl., at ¶¶ 3-11.

Shelby Police Capt. Combs and Sgt. Mack also assert that they are entitled to qualified immunity.  (Doc. 82, at 11-13.)  They point out that Combs testified in his deposition that he was not involved in the planning or execution of the search warrant.  Id. at 12, citing doc. 90, Combs dep, at 80.  In addition, they assert that

there is "absolutely no evidence to indicate that Capt. Combs participated in the actions at issue in this case." Id. at 12.

As to Sgt Mack, it is argued that there is also no evidence to show that Mack was involved in any constitutional violations which may have occurred, or that he was in any position to stop any of the purported violations. Id. at 12.

Further, they point out that the ASORT team was acting pursuant to a valid warrant, and there is no evidence that the officers entered the Bowles residence illegally. Id. at 12-13. Officers are entitled to take reasonable actions necessary to secure the premises. Id. at 13.

The issue of qualified immunity must be addressed at the earliest possible point in the litigation. Pearson v. Callahan, 129 S.Ct. 808, 815 (2009); Saucier, 533 U.S. at 200-201. The Supreme Court has stated that the inquiry regarding qualified immunity is distinct from the merits of the excessive force claim itself. Saucier, 533 U.S. at 204; Dunigan v. Noble, 390 F.3d 486, 491 n.5 (6th Cir. 2004).

A government official who is performing a discretionary function is entitled to qualified immunity from suit[10] as long as his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson, 129 S.Ct. at 815 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); Painter v. Robertson, 185 F.3d 557, 567 (6th Cir. 1999). In other

_____

[10] Qualified immunity is an immunity from suit, rather than a mere defense to liability. Pearson, 129 S.Ct. at 815 ; Saucier, 533 U.S. at 200; Dunigan, 390 F.3d at 490.

words, any "objectively reasonable" action by a state officer, as assessed in the light of clearly established law at the time of the conduct at issue, will be protected by qualified immunity.  Painter, 185 F.3d at 567.  Qualified immunity can be defeated if the official "knew or reasonably should have known" that the action he took would violate the constitutional rights of the plaintiff.  Harlow, 457 U.S. at 815.  Qualified immunity is a purely legal question which must be determined early in the proceedings.  Saucier, 533 U.S. at 200; Siegert v. Gilley, 500 U.S. 226, 232 (1991).

The defendants bear the initial burden of coming forward with facts which suggest that they were acting within the scope of their discretionary authority at the time in question.  Rich v. City of Mayfield Heights, 955 F.2d 1092, 1095 (6th Cir. 1992).  (The defendants here have met their initial burden:  it is uncontested that the police officers were acting in their official capacities.)

The burden then shifts to the plaintiffs.  The ultimate burden of proof is on the plaintiffs to show that the defendants are not entitled to qualified immunity.  Untalan v. City of Lorain, 430 F.3d 312, 314 (6th Cir. 2005); Cartwright v. City of Marine City, 336 F.3d 487, 490-491 (6th Cir. 2003) (citing Rich, 955 F.2d at 1095); Hamilton v. Myers, 281 F.3d 520, 531 (6th Cir. 2002).  Upon the assertion of qualified immunity, the plaintiffs must put forward "specific, nonconclusory factual allegations" that would defeat the immunity.  Siegert, 500 U.S. at 236 (Kennedy, J., concurring).

The Supreme Court recently held that the "two-step sequence" previously required by Saucier v. Katz "should no longer be regarded as mandatory," and that

45

district courts have discretion in "deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 129 S.Ct. at 818.  The two factors which are relevant to demonstrate whether or not the defendants are  entitled to qualified immunity from suit are "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." Pearson, 129 S.Ct. at 815-816 (internal citations omitted); see also  Saucier, 533 U.S. at 201.

Whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a general broad proposition." Saucier, 533 U.S. at 201.  The relevant inquiry in determining whether a right is clearly established is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Brosseau, 543 U.S. at 199; Saucier, 533 U.S. at 202. If the law does not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. Saucier, 533 U.S. at 201.  See also Pearson, 129 S.Ct. at 816 (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

"In other words, where a constitutional violation exists, an officer's personal liability turns on the 'objective legal reasonableness' of the action in view of the circumstances the officer confronted assessed in light of 'clearly established' legal rules." Dunigan, 390 F.3d at 491 (citing Saucier, 533 U.S. at 202; Anderson, 483 U.S. at 639).

### A.  Blust

The plaintiff contends that Blust should be denied qualified immunity because he violated her Fourth Amendment right to be free from illegal search and seizure.  (Doc. 110, at 49-53.)  Bowles has the burden of proof to show that Blust is not entitled to qualified immunity.  Untalan, 430 F.3d at 314; Cartwright, 336 F.3d at 490-491.  She must put forward "specific, nonconclusory factual allegations" to defeat the immunity.  Siegert, 500 U.S. at 236 (Kennedy, J., concurring).

Bowles points out that Blust was the investigator, case agent and affiant for the search.  (Doc. 110, at 50.)  Bowles argues that, although Blust averred in the affidavit[11] supporting the search warrant that officers observed McCoy at the Bowles residence (325 Greenlawn) on October 9, he could not recall who actually saw McCoy there on that day.  Bowles also asserts that the defendants "haven't produced any records confirming the allegations made in the search warrant."  Id.

Bowles states that Blust "had a duty to discover relevant information describing the target residence and to present such information to the judge asked to sign each search warrant and to ASORT before proceeding with the mission."  (Doc. 110, at 51.)

---

[11] Specifically, the affidavit reads, in relevant part:

On October 9, 2006, METRICH officers were conducting surveillance in reference to drug activity at 325 Greenlawn Ave., Mansfield, Richland County, Ohio.  Officers witnessed Michael McCoy on the front porch of this residence with several other B/M's.

(Doc. 80, DX C, at [13], Affidavit to Search, ¶ 17.)

47

Bowles contends that Det. Blust acted with a reckless disregard for the truth.

She argues:

> Defendant Blust's information that Mr. McCoy was at the house on the
> date of the search warrant was false.  He made an undocumented
> claim to the magistrate that the suspects had been at the house on the
> day before the warrant was served.  Although Defendant Blust thought
> someone had seen Mr. McCoy and African-American males on the front
> porch, surveillance of the residence would have disclosed the presence
> of African-American men who were not Mr. McCoy (Bryce Bowles).  Dr.
> Lyman concluded the search warrant was premature because of Blust's
> failure to place the suspect at the house. The warrant contained other
> information that Mr. McCoy actually lived in and used other locations
> to deal crack and cocaine.  Mr. McCoy was not at the house on the
> morning of October 10, 2006.  The search also failed to turn up any
> crack or cocaine.  The only drugs found in the house were a few
> marijuana seeds.  Under these facts, a jury could determine that
> Defendant Blust acted so unreasonably that his actions amounted to at
> least reckless disregard for the truth.

(Doc. 110, at 52.)

An officer may be liable under Section 1983 for making material false

statements either knowingly, or in reckless disregard for the truth, to establish

probable cause for a warrant.  Vakilian v. Shaw, 335 F.3d 509, 517 (6th Cir. 2003);

Wilson v. Russo, 212 F.3d 781, 786-87 (3d Cir. 2000).  "To overcome an officer's

entitlement to qualified immunity, however, a plaintiff must establish: (1) a

substantial showing that the defendant stated a deliberate falsehood or showed

reckless disregard for the truth and (2) that the allegedly false or omitted

information was material to the finding of probable cause."  Vakilian, 335 F.3d at

517.

48

An assertion is made with reckless disregard when, viewing all the evidence, the affiant entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.  Omissions are made with reckless disregard if an officer withholds a fact that any reasonable person would have known is the kind of thing the judge would wish to know.  Peet v. City of Detroit, 502 F.3d 557, 570 n.3 (quoting Wilson, 212 F.3d at 788).

In Maryland v. Garrison, and the related cases cited by Bowles, doc. 110, at 51, the issue involved confusion regarding specific dwelling units to be searched. See, e.g., Maryland v. Garrison, 480 U.S. 79 (1987).  In Garrison, the description of the place to be searched "was broader than appropriate because it was based on the mistaken belief that there was only one apartment on the third floor of the building," when in fact there were two separate apartments on that floor. Garrison, 480 U.S. at 85.  The Court judged the constitutionality of the officers' conduct "in light of the information available to them at the time they acted."  Id. The warrant was issued to search "the person" of a specific individual and "the premises" at a specific address.  Id. at 80.  The officers' investigation determined that the individual resided at the address on the third floor.  Id. at 85 n.10.

Here, the issue is the presence (or not) of the person sought.  Blust argues that he "collected evidence – including a controlled drug buy at the 325 Greenlawn home – that Myron Bowles Jr. ["Keith"] was selling drugs from that home, and that both Myron Bowles  [presumably, "Keith" again] and McCoy were trafficking in crack cocaine."  (Doc. 80, at 15, citing DX C, Blust decl., at ¶¶ 3-4.)  He claims that

49

officers observed McCoy visiting the Greenlawn location on the day the search warrant was sought.  Id. at 15, citing DX C, Blust decl., at ¶ 5.  Thus, Blust believed that there was probable cause to seek the warrant, and presented his affidavit and intelligence to the state judge, who issued a night-time search warrant to conduct the search for drugs.  Id. at 15-16, citing DX C, Blust decl., at ¶¶ 6, 8.)

Bowles characterizes the facts underlying Blust's sworn affidavit in support of the warrant application as "false," and contends that he acted with a "reckless disregard for the truth."  (Doc. 110, at 52.)  For example, Bowles argues that, although "Blust thought someone had seen Mr. McCoy and African-American males on the front porch, surveillance of the residence would have disclosed the presence of African-American men who were not Mr. McCoy."  Id.  The court is unclear as to how Bowles believes that the presence of other "African-American men who were not Mr. McCoy" precludes the presence of McCoy himself as well.

Similarly, the fact that "McCoy actually lived in and used other locations to deal crack and cocaine" does not rule out the possibility that McCoy used 325 Greenlawn also, particularly in light of the statement in the affidavit that McCoy had been witnessed at 325 "on numerous occasions."  (Doc. 80, DX C, at [13], Affidavit to Search, ¶ 18.)

Bowles points out that McCoy was not found at the house on the morning of October 10, 2006.  (Doc. 110, at 52.)  This does not render the sighting of McCoy on the previous day "false," necessarily.  It goes without saying that a person can be at a certain place at one point during a day, and then elsewhere later that same day.

50

Bowles also points out that the search failed to turn up any cocaine.  The actual evidence that emerges after a warrant is issued and executed has no bearing on whether or not the warrant was validly issued.  Garrison, 480 U.S. at 85.  The validity of a warrant is assessed on the basis of the information that the police possessed when they applied for the warrant.  Id.  See also Pierre v. Neudigate, No. 02-4424, 2004 WL 1238917, at *4 (6th Cir. June 3, 2004) (quoting Garrison).

To issue the warrant, the state judge found the existence of "probable cause to believe" that the evidence would be found at 325 Greenlawn.  As in any case, the belief may turn out to be mistaken, or the evidence may be moved in the time between the events supporting probable cause and the actual execution of the warrant.  Neither eventuality renders Blust's application for the warrant unreasonable or unconstitutional.

Bowles has not supported her assertions that Blust provided "false" information in his warrant application, or that he acted with reckless disregard for the truth.  Bowles has failed to carry her burden of proof to show that Blust is not entitled to qualified immunity.  Untalan, 430 F.3d at 314; Cartwright, 336 F.3d at 490-491; Vakilian, 335 F.3d at 517.  She has failed to designate specific facts showing that there is a genuine issue of material fact as to whether Blust is entitled to qualified immunity.  The Mansfield defendants' motion for summary judgment (doc. 80) should be GRANTED on the issue of qualified immunity as it pertains to Blust.

B.  Combs and Mack

Bowles argues that Combs and Mack should be denied qualified immunity. (Doc. 110, at 48-49.)  Bowles has the burden of proof to show that Combs and Mack are not entitled to qualified immunity.  Untalan, 430 F.3d at 314; Cartwright, 336 F.3d at 490-491.

Bowles states that Combs was the ASORT Commander at the time of the raid, and that Mack was the ASORT Team Leader for the operation.  (Doc. 110, at 7.)  Bowles argues that the relevant constitutional violation involving Combs and Mack was the "unreasonable forced entry and . . . excessive force."  (Doc. 110, at 49, also id. at 8-9.)  Although Combs was not at the raid, "his policies were being followed," and "Mack was at the raid and provided on-the-scene direction under those policies."  Id. at 49.  Bowles does not specify which policies are at issue.  See generally id. at 48-49.

Combs and Mack respond that they did not violate any of Bowles' constitutional rights.  (Doc. 82, at 12.)  Combs testified that he was not involved in the planning or execution of the search warrant for the Bowles residence.  (Doc. 82, at 12, citing doc. 90, Combs dep., at 80.)  Because there is "absolutely no evidence to indicate Capt. Combs participated in the actions at issue in this case," he argues there is no basis for holding him liable for any constitutional violation.  Id.

As to Mack, the Shelby defendants assert there is "also no evidence to show that Sgt. Mack was involved in any constitutional violations which may have occurred or that Sgt. Mack was in any position to stop any of the purported

violations." (Doc. 82, at 12.)  Mack was not identified as being involved in Bowles' detention, and there is no indication that he was in any position to observe these activities.  Id.

Bowles, however, relies on the policy involvement of Combs and Mack, rather than their personal actions during the warrant execution.  (Doc. 110, at 48-49.) Combs was not at the raid,  but "his policies were being followed," and "Mack was at the raid and provided on-the-scene direction under those policies."  Id. at 49. Bowles does not identify the policies at issue, but refers the court to the "unreasonable forced entry and . . . excessive force" in her factual statement.  Id. at 49, citing id. at 8-9.

The "excessive force" that Bowles was subjected to appears to consist of being handcuffed and having guns "pressed against her head" for approximately five minutes while the officers determined that McCoy was not in the house, and remaining handcuffed on the couch while the officers conducted the search of the residence.[12]  (Doc. 110, at 8; see also id. at 24.)  The use of the flash-bang device is not referenced on the cited pages (see id. at 8-9), but is conceivably part of her excessive force claim as well.  See  id. at 24.

The Shelby defendants point out that Bowles makes no allegations that Combs was personally involved in the planning or execution of the warrant

_____

[12] Bowles does not maintain that the officers used excessive force in handcuffing her.  See, e.g., doc. 110, at 8 (officers screamed at her to get down, "so she got down on the floor"), and 27 ("Bowles immediately got down on the floor and put her hands behind her back").

operation.  (Doc. 116, at 19.)  Further, they assert that Bowles points to "absolutely no evidence that Captain Combs set any policies causing any inappropriate conduct with respect to the execution of the warrant," nor has she shown any ASORT policies which were promulgated by Combs, which in any event are not within his power to enact.  Id.  The court agrees that Bowles has not demonstrated any involvement of Combs in formulating any policies regarding knock-and-announce entries, the use of flash-bang devices, or the use of handcuffs or pointed weapons to restrain an individual during the execution of a search warrant.

The Shelby defendants also note that Bowles has made no allegations that Mack participated in, or observed, the force allegedly used against her.  (Doc. 116, at 20.)  They point out that Mack testified that standard procedure was to have the ASORT team knock on the door, and then announce, "pretty loud," that they are police officers, there to serve a search warrant.  (Doc. 116, at 20; doc. 95, Mack dep., at 32-34.)  After the knock-and-announce, the team waits "a reasonable time" before making a forced entry.  Determining "a reasonable time" varies from call to call, but includes factors such as the time of day, size of the home, and other facts known to the officers.  (Doc. 116, at 20; Mack dep., at 36-38.)  However, again, Bowles has not demonstrated any involvement of Mack in any policies regarding knock-and-announce entries, the use of flash-bang devices, or the use of handcuffs or weapons to restrain an individual during the execution of a warrant.

Bowles has not supported her assertions that Combs and Mack were responsible for ASORT policies concerning the alleged constitutional violations.

54

Bowles has failed to carry her burden of proof to show that Combs and Mack are not entitled to qualified immunity.  Untalan, 430 F.3d at 314; Cartwright, 336 F.3d at 490-491.  She has failed to designate specific facts showing that there is a genuine issue of material fact as to whether Combs and Mack are entitled to qualified immunity.  The Shelby defendants' motion for summary judgment (doc. 82) should be GRANTED on the issue of qualified immunity as it pertains to Combs and Mack.


VII  ASORT

ASORT asserts that it is not a separate legal entity.  (Doc. 81.)  The court has found ASORT to be an unincorporated association.  (See supra, at Sect. IV.A.)  However, it is undisputed that, whatever the status of ASORT, the ASORT defendants were acting under color of state law.

Bowles' federal claims against ASORT allege a constitutional violation:

The policies set by ASORT policymakers caused Vanessa Bowles not to learn that the police were at her door and also caused her to be subjected to a forced entry by officers who did not wait a reasonable time. These policies were the moving force behind the unreasonable seizure and excessive force in this case.

(Doc. 110, at 43.)  ASORT argues that no violation of her constitutional rights occurred.  (Doc. 82, at 5.)

55

The court finds that the disputed actions[13] of ASORT team members were not objectively unreasonable.  The court has already determined that Bowles' testimony that she was asleep prior to being awakened by a loud noise does not contradict the ASORT officers' testimony that they properly knocked and announced before entering her residence.

The use of a flash-bang is "neither per se objectively reasonable nor unreasonable." Kirk v. Watkins, 182 F.3d 932, 1999 WL 381119, at *3 (10th Cir. 1999) (TABLE, text in WESTLAW).  The use of a flash-bang device may be reasonable under proper circumstances, for example, where the police believed that the suspect was armed and previously had a history of violence.  United States v. Dawkins, No. 01-6151, 2003 WL 22905305 (6th Cir. Nov. 24, 2003). See also Bing v. City of Whitehall, 456 F.3d 555, 569 (6th Cir. 2006) (rejecting excessive force claim where use of flash-bang device inside house was reasonable under the circumstances).

The Operational Plan for the warrant execution noted that "Patrol has removed guns from the residence in the past."  (Doc. 88, DX 24, Operational Plan, at [4]; see also doc. 80, DX C, at [3], Blust decl, ¶ 7.)  The affidavit in support of the warrant also noted the officers' concern that "weapons are frequently carried on the persons of those persons where drugs are being sold."  (Doc. 80, DX C, at [15],

---

[13] ASORT notes that the ASORT team was not involved in the warrant application, but rather served to enter the premises and secure the location.  (Doc. 82, at 3.)

Affidavit to Search, ¶ 19.)  Bowles has not demonstrated that the use of the flash-bang device was unreasonable.

Subsequently, Bowles was subjected to being handcuffed and having guns "pressed against her head" while the officers determined that McCoy was not in the house, and remaining handcuffed on the couch while the officers completed the search.  (Doc. 110, at 8; see also id. at 24.)  In her memoranda, Bowles presents herself as compliant with the officers' demands when they encountered each other in the hallway outside her room  See, e.g., doc. 110, at 8 (officers screamed at her to get down, "so she got down on the floor"), and 27 ("Bowles immediately got down on the floor and put her hands behind her back").

Her deposition testimony presents more of a confrontation:

A.  They were yelling, screaming something about search warrant.  I don't know what all they said.

* * * * *

Q.  And the uniforms that they were wearing, did you ultimately learn what law enforcement agency they were employed by?

A.  No, I didn't.  I didn't know it made a difference who they were or where they came from.  I just knew that they were law enforcement.

* * * * *

Q.  And they said "search warrant," correct?

A.  I believe.  I believe it was search warrant.

Q.  And what did you say?

A.  I didn't say anything.  I said, I don't know at what point but I think I remember saying, "Are you serious?"

57

Q. And to whom did you say that to?

A. I don't know the people's names.  I don't know any of their names.

Q. And what happened next?

A. The guy screamed, "Yeah, I'm serious.  Get down."  And then he said – I think they screamed it a couple of times or a lot of times, so I got down on the floor.

(Doc. 66, Bowles dep., at 73-75.)

Bowles' deposition testimony is corroborated by the police officers.  Officer

Bammann testified that he and Officer John Magers encountered Bowles in the

hallway:

A. He [Magers] was ordering her to get down and she was refusing. He ordered her several times, she still didn't comply so I placed her on the ground.

Q. Then what happened?

A. She was secured and that was my involvement.

(Doc. 86, Jason Bammann dep., at 64.)

Q. Tell me what Magers said to Bowles and what she said to him.

A. He was –

Q. In the hallway.

A. He was ordering her to get down.  Her position in that hallway was blocking the entire SWAT team from going back and clearing the remaining rooms in this residence.

Q. Okay.

A. So it was imperative that she got out of the way and got down.

Q. Okay.  So what was he saying to her?

58

A.  To get down.

Q.  And what did she say to him?

A.  I remember her being confrontational, telling him no, like what's going on.  I don't remember specifically what she said but she was being confrontational with us.

(Doc. 86, Bammann dep., at 68-69.)  The officers' actions to secure Bowles to be able to continue to carry out their valid search warrant were not unreasonable.  See Muehler v. Mena, 544 U.S. 93, 98-100 (2005); Michigan v. Summers, 452 us. 692, 705 (1981).

If the search and seizure, and the force used, were objectively reasonable, then no constitutional violation occurred.  And if there is no underlying constitutional violation, there can be no cause of action under Section 1983 against ASORT, whatever its precise legal status.  See, e.g., City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); see generally 42 U.S.C. § 1983.

Bowles has failed to demonstrate that the disputed actions of ASORT team members were objectively unreasonable.  As discussed above, Bowles' testimony that she was asleep prior to being awakened by a loud noise does not contradict the ASORT officers' testimony that they properly knocked and announced before entering her residence.  In addition, Bowles has not demonstrated that the use of the flash-bang device, or the force used to secure her during the search, was an unreasonable use of force.

ASORT's motion for summary judgment on the merits of the Section 1983 claim (doc. 82) should be granted.

59

## VIII.  STATE LAW CLAIMS

The remaining claims (assault and battery, negligent infliction of emotional distress, and intentional infliction of emotional distress) are based on Ohio law.  See doc. 49, Am. Compl., at ¶¶ 29-32.  Since the federal cause of action should be dismissed, the state causes of action should be dismissed for lack of jurisdiction. United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966).  This principle may be raised sua sponte by the court.  See Abramson v. Abramson, 991 F.2d 799, 1993 WL 130193 at *4 (7th Cir. 1993) (TABLE, text in WESTLAW); Norton v. Cobb, 744 F.Supp. 798, 800-801 (N.D. Ohio 1990).

## IX.  SUMMARY

The defendants' motions for summary judgment (doc. 78, 79, 80, and 82) should be GRANTED on the issue of municipal liability, except as to ASORT.

The Mansfield defendants' motion for summary judgment (doc. 80) should be GRANTED on the issue of qualified immunity as it pertains to Blust.  The Shelby defendants' motion for summary judgment (doc. 82) should be GRANTED on the issue of qualified immunity as it pertains to Combs and Mack.

The court finds that ASORT is a "person" which may be sued under Section 1983, thus,  ASORT's motion for summary judgment (doc. 81) on that issue should be DENIED, because it has failed to demonstrate that it is entitled to judgment as a matter of law.  However, ASORT's motion for summary judgment on the merits of the Section 1983 claim (doc. 82) should be GRANTED.

<u>RECOMMENDATION</u>

It is recommended that ASORT's motion for summary judgment regarding its legal status (doc. 81) be DENIED, as discussed above.  It is recommended that the other motions for summary judgment,  (doc. 78, 79, 80, and 82), discussed above be GRANTED.  The state causes of action should be dismissed for lack of jurisdiction.


Dated:  ___July  10, 2009___         ___/s/ Kenneth S. McHargh___
                                      Kenneth S. McHargh
                                      United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the District Court's order.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).