# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **VANESSA BOWLES,** | : | **Case No.  1:07-CV-2276** |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| **CITY OF MANSFIELD,** *et al.*, | : | <u>**MEMORANDUM AND ORDER**</u> |
| **Defendants.** | : | |

Before the Court is the Report and Recommendation (R&R) of Magistrate Judge Kenneth S. McHargh ("Judge McHargh").  (Doc. 121.)  In his R&R, Judge McHargh considers the Defendants' Motions for Summary Judgment (Docs. 78-82), as well as the Plaintiff's Motion to Exclude the Defendants' Expert Testimony (Doc. 75).  He recommends that this Court grant the Defendants' motions in full, except insofar as one of the Defendants claims that it is not *sui juris*.  The Plaintiff has filed a timely objection to this R&R (Doc. 125), as have the Defendants (Docs. 122-124, 126).  The Court now **<u>OVERRULES</u>** those objections and **<u>ADOPTS</u>** the R&R, as explained below.  Accordingly, the Defendants' Motions for Summary Judgment (Docs. 78-80, 82) are **<u>GRANTED</u>**, except to the extent that Defendant ASORT has moved for summary judgment on the grounds that it is not *sui juris* (Doc. 81), a motion that is **<u>DENIED</u>**.

## I.  BACKGROUND

This lawsuit arises under 18 U.S.C. § 1983 as well as state law.  The gravamen of the complaint is straightforward: the Plaintiff asserts that the Defendants violated her rights under the fourth and fourteenth amendments of the constitution:

> The Defendants have, under color of law, deprived Plaintiff of clearly established rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution of which a reasonable person would have known. These rights include, but are not limited to, the right to due process of law and the right to be free of unreasonable searches and seizures and excessive force.

(Doc. 49 ("FAC") at ¶ 28.)

The particulars of this litigation are more complicated.  Although the Plaintiff maintains two discrete constitutional violations at this stage of litigation, failure to properly knock-and-announce and use of excessive force, her claims are presented to the Court in a somewhat unusual posture, and have led to hundreds of pages of briefing, many thousands of pages of record evidence, and a 61-page R&R.

## II.  STANDARD OF REVIEW

### A.  Summary Judgment

Defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Under Rule 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

In reviewing summary judgment motions, this Court must view evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).  Determination of whether a factual issue is "genuine" requires consideration of the applicable

evidentiary standards.  Thus, in most civil cases, the Court will decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Anderson*, 398 U.S. at 252.

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the non-moving party's claim.  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citation omitted); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 & n.12 (6th Cir. 1989).  The moving party, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In response, if the moving party establishes the absence of a genuine issue of material fact, to defeat summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citation omitted).  In this regard, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment"; rather, "Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact."  *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (citation omitted); *see also Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008) (citation omitted).  Moreover, the non-moving party must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-

moving party to show that there is some metaphysical doubt as to material facts.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Barr v. Lafon*, 538 F.3d 554, 574 (6th Cir. 2008).

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict – whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." (emphasis in original) (internal quotations omitted)).

### B.  Report and Recommendation

On March 17, 2008, the Court referred this case to Judge McHargh for pretrial administration, pursuant to Title 28 of the United States Code, Section 636, and Local Rule 72.1.  (Doc. 48.)  In cases that are referred to a magistrate judge for preparation of an R&R, the district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *McClendon v. Challenge Fin. Investors Corp.*, No. 08-1189, 2009 U.S. Dist. LEXIS 17908, at *6-7 (N.D. Ohio Mar. 9, 2009) (quoting 28 U.S.C. § 636(b)(1)(C)).  A court is only required to conduct a *de novo* review of the portions of an R&R to which the parties have made an objection, and the parties have a "duty to pinpoint those portions of the magistrate's report that the district court must specially consider."  *Cincinnati Ins. Co. v. Grand Pointe, LLC*, 501 F. Supp. 2d 1145, 1153 (E.D. Tenn. 2007) (quoting *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. Ohio 1986)).  In the absence of specific objections, a court may adopt conclusions reached by the magistrate judge without discussion.  *See*

*Thomas v. Arn*, 474 U.S. 140, 149-52, (1985); *Crum v. Sullivan*, 921 F.2d 642, 645 n.1 (6th Cir. 1990).[1] While this principle is universal, it is particularly appropriate here, given that Judge McHargh issued a thoughtful 61-page R&R in response to many thousands of pages of briefing and exhibits.

### III. REQUIREMENTS FOR ESTABLISHING LIABILITY UNDER § 1983

All of the Plaintiff's federal claims arise under 42 U.S.C. § 1983, which requires the Plaintiff to "establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citations omitted). The Defendants in this action do not dispute that they acted under color of state law during any of the relevant events – accordingly, the question is simply whether the Plaintiff suffered a depravation "of a right secured by the Constitution or laws of the United States" and were harmed thereby. *Id.* With respect to that question, it is important to acknowledge at the outset that many unfair, unwise, or imprudent actions are not necessarily constitutionally unreasonable. *See Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001). Law enforcement officials are allowed "latitude for honest mistakes," even when those mistakes are difficult to understand with the benefit of hindsight. *See Maryland v. Garrison*, 480 U.S. 79, 87 (1987). Nevertheless, each and every citizen has meaningful constitutional rights that law enforcement officials may not violate. *See Champion v.*

---

[1] As another Court rightly explained:

> If a party files a general objection and incorporates other papers by reference and that approach undermines the purposes of the Magistrate's Act, that party will have waived the right to appeal. *Neuman v. Rivers*, 125 F. 3d 315 (6th Cir. 1997). While a district judge plainly has authority to go back through the record to determine whether a report and recommendation[] should be adopted, that approach would undermine the purpose of the Magistrate's Act to provide assistance of subordinate judicial officers to Article III judges. If an Article III judge must repeat the process in which the magistrate judge engaged, instead of being directed to specific objections, what use is the reference?

*Gonzales v. Wolfe*, No. 1:04cv208, 2006 U.S. Dist. LEXIS 73370, at *3-4 (S.D. Ohio July 5, 2006), *adopted*, 2006 U.S. Dist. LEXIS 69073 (S.D. Ohio, Sept. 26, 2006), *aff'd*, 290 Fed. Appx. 799 (6th Cir. 2008); *cf. Gonzales*, 290 Fed. Appx. at 814 (accepting the unremarkable argument that a district court, rather than a Magistrate Judge, must ultimately review properly raised objections).

*Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004).  These rights are not lessened merely because law enforcement officials elect to execute a search warrant with a SWAT team.  *Holland v. Harrington*, 268 F.3d 1179, 1194-95 (10th Cir. 2001) ("At all times, SWAT officers no less than others . . . must keep it clearly in mind that we are not at war with our own people."); (*contra* Doc 76 ("J. Bammann Dep.") at 61:12-62:9 ("If I'm at your house in a SWAT capacity we're not dealing with a normal law-abiding citizen I would say at that point.")).

If the Plaintiff can show such a violation, however, she must still establish the propriety of recovery from any particular party.  *See Petty v. County of Franklin, Ohio*, 478 F.3d 341, 349 (6th Cir. 2007).  Although this analysis begins with the familiar requirement that a specific defendant proximately caused the constitutional deprivation, establishing that proximate cause within the context of § 1983 is sometimes quite "murky."  *Wright v. City of Canton*, 138 F. Supp. 2d 955, 965 (N.D. Ohio 2001).  So, too, even when an individual law enforcement official has proximately caused the deprivation of a constitutional right, that official will not be held liable unless that right was "clearly established" and that official has caused the deprivation in an "objectively unreasonable manner."  *See Champion*, 380 F.3d at 901.  Because liability under § 1983 can be a somewhat complex topic, it is helpful to begin by establishing the distinct requirements for individual and municipal liability.

### A.  Individual Liability

While lawsuits under § 1983 frequently provide "the only realistic avenue for vindication of constitutional guarantees," *Champion*, 380 F.3d at 901 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)), those lawsuits also impose a very substantial cost on society, "including 'the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office.'"  *Id.*  It has long been recognized that officials cannot perform their jobs safely or effectively if their every split-second decision is analyzed with knowledge gained only through hindsight.  *See Kostrzewa*, 247 F.3d at 639 (citing *Graham v. Connor*, 490 U.S. 386 (1989)).

Actions taken by law enforcement officials that appear unreasonable to a court weighing those actions over a period of months were not necessarily unreasonable when made in a matter of seconds under life-threatening pressure.  *See id*.  The doctrine of qualified immunity provides a balance: it holds that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights  of which a reasonable person would have known."  *Champion*, 380 F.3d at 901.

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-prong test for evaluating the claim of qualified immunity.  First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Id.* at 201.  Second, "if a violation could be made out on a favorable view of the parties' submissions, the next . . . step is to ask whether the right was clearly established."  *Id.*  A motion for summary judgment on qualified immunity grounds must be granted unless the plaintiff can satisfy both prongs of the *Saucier* test.[2]  A court is not required to address the first question if it is evident that, even if a right was violated, that right was not clearly established at the time of the violation.  *See Pearson v. Callahan*, 129

---

[2] Various panels of the Sixth Circuit have broken the two-prong Saucier test for qualified immunity into three-prongs:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred.  Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known.  Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Champion*, 380 F.3d at 901 (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).  The first two prongs of this test, of course, mirror the two prongs of *Saucier*.  The third prong explicitly examines the reasonableness requirement that other courts find implicit in *Saucier*.  *See Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005).  Some Sixth Circuit panels have held, however, that the three-prong approach is unnecessary in most cases, because "[i]n many factual contexts . . . the fact that a right is 'clearly established' sufficiently implies that its violation is objectively unreasonable."  *Causey v. City of Bay City*, 442 F.3d 524, 528 n.2 (6th Cir. 2006).

This Court believes the two-prong approach to be particularly appropriate in cases, such as this one, in which neither party addresses the three-prong approach in briefing.

S. Ct. 808, 818 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

The idea captured by the second prong of *Saucier* is that "an official could not . . . fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. For this reason, plaintiffs bringing suit under § 1983 must show that "in the light of pre-existing law," a reasonable officer would have understood that the actions for which he now faces suit were unlawful. *Champion*, 380 F.3d at 902.[3]  This inquiry must be undertaken with respect to the specific situation that an individual defendant faced.  *See id*.  It is not enough, for example, to show that an officer's use of force exceeded the objective standard for reasonable force under *Graham*, rather, a plaintiff must show that any reasonable officer would have understood that the particular force he was using in that particular situation was excessive.  *See id*.  The Supreme Court and the Sixth Circuit have, however, rejected the contention that a right is only clearly established if the plaintiff can demonstrate the existence of a "fundamentally similar" or "materially similar" case.  *Grawey v. Drury*, 567 F.3d 02, 313-14 (6th Cir. 2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  They have explained:

> the question is whether the defendants had fair warning that their actions were unconstitutional.  Thus, officials can still be on notice that their conduct violates established law even in novel factual circumstances.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Id*. (citations and quotation markings omitted); *see also Champion*, 380 F.3d at 902 ("[T]he fact that various courts have 'not agreed on one verbal formulation of the controlling standard' does not by itself entitle an officer to qualified immunity." (quoting *Saucier*, 533 U.S. at 203)).  Because the focus is on

---

[3] To determine whether a right is clearly established, this Court must consider the decisions of the Supreme Court, followed by the decisions of this Circuit, followed by the decisions of other district courts within this Circuit, and finally the decisions of other circuits.  *Champion*, 380 F.3d at  902.

whether the officer had fair notice that his conduct was lawful, reasonableness is judged against the backdrop of the law at the time of the conduct.

### B. Municipal Liability

When plaintiffs seek to recover from a municipality, there is no requirement that a particular right be "clearly established," but the plaintiffs must then show that the municipality itself was the proximate cause of any deprivation. *See Collins v. City of Harker Heights*, 503 U.S. 115, 122, (1992); *Ford v. County of Grand Traverse*, 535 F.3d 483, 495-96 (6th Cir. 2008). There is no vicarious liability under § 1983 for the alleged torts of a municipality's agents, rather:

> It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also Board of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.") (citation omitted). Simply put, to impose § 1983 liability upon a local government body, a plaintiff must show that the municipality itself is the wrongdoer. *Collins v. City of Harker Heights*, 503 U.S. 115, 122, (1992).[4]

A plaintiff can establish that municipality is the proximate cause of a violation under any of five theories: (1) express municipal policy, *Monell*, 436 U.S. at 660-61, (2) "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law," *City of St. Louis v. Praprotnick*, 485 U.S. 112,

---

[4] This rule applies equally to private organizations that provide law enforcement: the Plaintiffs need not show that the right of which they were deprived was "clearly established," but they must demonstrate that the organization itself proximately caused any violation. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (collecting cases); *Street v. Corrections Corp. of Am.*, 102 F.3d 810, 817-18 (6th Cir. 1996).

127 (1988) (quotation omitted), (3) the decision of a person with final policy making authority, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986), (4) the failure to act where the "inadequacy [of the existing practice is] so likely to result in the violation of constitutional rights, that the policymaker . . . can reasonably be said to have been deliberately indifferent to the [plaintiff's rights]," *City of Canton v. Harris*, 489 U.S. 378, 390 (1989),[5] or (5) ratification by a municipality of its employee's unconstitutional acts by failing to meaningfully investigate and punish allegations of unconstitutional conduct, *Fuller v. City of Oakland*, 47 F.3d 1522, 1535 (9th Cir. 1995); *see also Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989); *Wright*, 138 F. Supp. 2d at 966 ("[Plaintiff] can establish his municipal liability claim by showing . . . [that] a final municipal policymaker approved an investigation . . . that was so inadequate as to constitute a ratification of their alleged use of excessive force.").

## IV. THE LEGAL STATUS OF ASORT

Prior to considering the substantive merits of the Plaintiff's claims, this Court must consider whether one of the Defendants, ASORT, is subject to suit at all.  ASORT asserts that it is immune from suit under the same principles that immunize municipal police departments, whereas the Plaintiff asserts, and Judge McHargh found, that "ASORT is an unincorporated association which is amenable to suit under federal law."  (R&R at 25.)  The Court analyzes this issue somewhat differently than either the Plaintiff or the Defendants suggest, but ultimately adopts Judge McHargh's recommendation as to ASORT's legal status.

---

[5] This category includes deliberately indifferent training or supervision, *Canton*, 489 U.S. at 390; *see also Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006), deliberately indifferent hiring, *Brown*, 520 U.S. at 410-11; *see also Doe v. Magoffin County Fiscal Court*, 174 Fed. Appx. 962, 967 (6th Cir. 2006), and deliberately indifferent failure to adopt policies necessary to prevent constitutional violations, *Conn v. City of Reno*, 572 F.3d 1047, 1064 (9th Cir. 2009); *see also Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992).

**A.  The Structure and Scope of ASORT**

ASORT was formed by a private entity, the Richland County Chiefs of Police Association (RCCPA).  (R&R at 14-15.)[6]  ASORT's designated 30(b)(6) deponent explained that the RCCPA:

> meet[s] every Wednesday morning at 7:30 basically for breakfast and just [to] have general discussion about what is going on in the community.  <u>We probably are more of a social organization than anything</u>.

(Doc. 96 ("Messer Dep.") at 20:11-20) (emphasis added).  This "social organization" sets at least some aspects of ASORT policy.  (*See* Doc. 90 ("Combs Dep.") 22:14–15 ("The [RCCPA] really makes decisions concerning personnel and/or training.").  Although ASORT has been represented by counsel throughout this litigation, that counsel does not appear to know how he came to be retained.  (*See* 9/24/09 Hrg. Tr. at 9:23 – 10:15.)[7]

---

[6] The ASORT manual refers to the Richland County Association of Chiefs of Police, which it abbreviates "RCACP."  (*Rush*, *et al.* v. *City of Mansfield*, *et al.*, Case No. 07-1068 (Doc. 169-5) (N.D. Ohio) at 9).  The Court gathers from the record evidence that the "RCACP" referenced in the ASORT manual is the same as the "RCCPA" referenced by the Defendants in depositions.  For consistency, the Court will refer to this organization as the "RCCPA" throughout this opinion, even when referencing the ASORT manual.

[7] The Court's exchange with counsel on this point follows:

| | |
|---|---|
| THE COURT: | Okay.  Let me ask you, who retained you to act on behalf of ASORT? Who is your client? |
| COUNSEL: | Well, the client would be the home departments ultimately that we represent, but – |
| THE COURT: | Do you have a representation agreement with every home department that's been sued?  Is that how you represent ASORT? |
| COUNSEL: | I don't believe so, Your Honor.  I can't specifically answer that question here today. |
| THE COURT: | You don't know who your client is? |
| COUNSEL: | Well, I understood who my clients were as far as the municipalities, the officers involved, but my understanding was there was an agreement that we would represent ASORT in this matter through our representation of those municipalities. |

The Commander of ASORT reports to the RCCPA.  (*Rush*, *et al*. v. *City of Mansfield*, *et al*., Case No. 07-1068 (N.D. Ohio) (Doc. 169-5) ("ASORT Manual") at 9.)[8]  The ASORT Commander at the time of the events in question, Lance Combs, testified, however, that he has never actually attended an "official" RCCPA meeting.  (Combs Dep. at 24:16–17 ("I've had to attend Chiefs' breakfasts as opposed to really official Chiefs' meetings.").)  Indeed, Commander Combs testified that he does not know how it is he became the Commander of ASORT:

> QUESTION:  And how did you get selected as the commander?
>
> ANSWER:    My guess is that the [RCCPA] made that selection.  I wasn't privy to the selection process.
>
> QUESTION:  Did you apply for it?
>
> ANSWER:    No.

(Combs Dep. at 21:5-11.)  In sum, then, ASORT, which provides SWAT-type teams to area municipalities, was formed by a private social organization and is governed to some extent by that

---

> THE COURT:   All right.  But you don't know if you actually represent the municipalities?
>
> COUNSEL:     Oh, I represent the City of Lexington and the City of Shelby.
>
> . . . .
>
> THE COURT:   So is it Shelby and Lexington that is paying for you to represent ASORT?
>
> COUNSEL:     I think ultimately it comes through an insurance defense agreement through an insurance carrier.
>
> THE COURT:   Does ASORT have independent insurance?
>
> . . . .
>
> COUNSEL:     I'm not exactly sure, Your Honor.

(9/24/09 Hrg. Tr. at 9:23-11:9.)

[8] ASORT Team Members report to their ASORT Team Leaders, who in turn report to the ASORT Commander.  (ASORT Manual at 9.)

private social organization.  This is a marked departure from the usual structure for multijurisdictional law enforcement agencies or teams.  *See, e.g., Petty v. United States*, 80 Fed. Appx. 986, 987 (6th Cir. 2003) (describing "a multi-jurisdictional task force directed by the Federal Bureau of Investigation . . . ."); ED WITTENBERG, EUCLID, SHAKER HEIGHTS, SOUTH EUCLID, UNIVERSITY HEIGHTS EYE JOINT SWAT TEAM (April 8, 2010, available on-line at http://www.cleveland.com) ("The councils of all four cities will need to approve legislation . . . for the plan [forming a regional SWAT team] to take effect."); TRENTON, OHIO COUNCIL MEETING MINUTES (January 15, 2009) ("An Ordinance Authorizing the City Manager of the City of Trenton, Ohio to Enter Into a Memorandum of Understanding for Regional S.W.A.T. Team . . . ." (capitalization changed throughout)).

Membership in ASORT is voluntary, but limited to law enforcement officials from the various police departments in Richland County.  While ASORT itself is regulated by the RCCPA, the members of ASORT are subject to a variety of benefits and restrictions that are specific to their "home" police departments.  Each municipality in Richland County has agreed to fund the cost of training and equipment for any one of their law enforcement officials that joins ASORT.  (*Id.* at 15-16; Messer Dep. at 20:12-23:8.)[9]  ASORT members, as well, are governed by both ASORT policies and the policies of their home law enforcement agencies when on ASORT assignment.  (Combs Dep. at 54:24-55:2.) Finally, ASORT asserts that home departments are responsible for discipline of their members (R&R at 15), although the record indicates that no home department has ever disciplined a member of ASORT for actions taken when deployed by ASORT.[10]

---

[9] Each municipality determines how many ASORT Team Members it can afford to fund, which sets a limit on how many law enforcement officials from a given municipality may volunteer to join ASORT.

[10] ASORT argues that individual departments are responsible for the training of their own members (R&R at 15), but this assertion conflicts with testimony from ASORT Commander Combs (Combs Dep. at 22:18-19 ("[W]hen it came time for decision-making, that authority, especially for training, the authority rested with me.")).  For purposes of summary judgment, then, the Court assumes that ASORT training is provided through ASORT itself.

If ASORT members are bound in scope by certain requirements of their home departments, ASORT itself is not.  ASORT may choose to accept or reject requests for assistance from any of the area municipalities.  (Combs Dep. at 91:16-17 ("The [ASORT] team leader has the authority to accept or deny [a] mission.").)  So, too, ASORT may enter a municipality even when no official from that municipality has requested their help directly and even without notice to any official in that municipality.  (*See* 9/24/09 Hrg. Tr. at 48:21 – 49:8.)

### B.  The Parties' Arguments

ASORT argues that it is not subject to suit because it is a "government unit."  ASORT asserts that it:

> is a statutorily authorized cooperative between municipalities, specifically assembled for the purposes of furthering law enforcement.  Were [ASORT] simply a police unit of a single municipality, the police unit would not have capacity to be sued, and Plaintiffs' claims would be treated as against the municipality.  Indeed, the Magistrate Judge implied that if the incident in question involved an impromptu, collective response from various police departments, there would be not capacity to sue the collective. [ASORT's] cooperative configuration does not present a situation so different as to apply Fed.R.Civ.P. 17(b) where it would not normally be applied to governmental units.

(Doc. 126 ("ASORT Obj.") at 3) (citations omitted) (emphasis added).  ASORT, however, is not part of any <u>particular</u> municipality, which raises the question as to whom, if anyone, ASORT believes is subject to suit if an ASORT policy (as distinct from home department policies) proximately causes the deprivation of a constitutional right.

ASORT adopted a somewhat cryptic stance when confronted with that question:

> THE COURT:  Okay.  If in fact I find that a constitutional violation occurred, so say hypothetically Mansfield calls out ASORT for a search in Mansfield and I find that members of the ASORT team, not necessarily Mansfield officers, but members of the ASORT team engaged in conduct that would constitute a constitutional violation . . . is then Mansfield [potentially] liable for their activities because they have called them in and therefore deputized them for purposes of their own governmental activity, or do you believe that each entity that sent someone there is responsible for their activities, or is nobody responsible for their activities?

14

ASORT COUNSEL:    Well, Your Honor, we would argue that it is the home department municipality that is ultimately bearing the responsibility for the officers.  <u>It is a collective group of those police departments and those municipalities, and we would consider that they are dictated by their own policies.  Therefore, if the officer from a specific home department acts outside the scope of those policies or creates a constitutional violation through his actions, that home department municipality employer would be the entity that is actually capable of being sued</u>.

. . . .

THE COURT:    All right.  So you don't believe in the hypothetical that I have posed that Mansfield would have any responsibility for calling out these members, other than for the activities of its own officers, if they happen to even be on the team?

ASORT COUNSEL:    That's correct, Your Honor  I would propose to you that again, the ASORT team members are voluntarily signing up to be part of this, and each collective home department allows them to volunteer for that purpose.  Based upon that, I guess, volunteering of the officers, the home department policy still dictates . . . .

(9/24/09 Hrg. Tr. at 4:9-6:4) (emphasis added).

ASORT seems to argue that it does not truly have its own policies when it contends that ASORT "would consider [team members' actions to be] dictated by their" home department policies.  But there is substantial testimony and evidence indicating that ASORT *does* have its own policies, for example, there is an ASORT manual that contains policies (*See Rush*, *et al*. v. *City of Mansfield*, *et al*., Case No. 07-1068 (Doc. 169-5) ("ASORT Manual"), Commander Combs testified that he is responsible for ASORT training (Combs Dep. at 22:18-19), and ASORT counsel argued that the RCCPA is responsible for ASORT training (4/9/09 Hrg. Tr. at 44:5-8 ("THE COURT: So this social organization [the RCCPA], as you call it, sets the standards for the training?  COUNSEL:  Correct.  And it is actually in the ASORT policy manual."); *contra Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir. 1995) ("Because the Task Force was nothing more than a joint effort of four counties in the State of Indiana to implement existing law enforcement policies, no new or unique policies were needed.").  ASORT, then, does not

provide a plausible argument as to what entity it believes is subject to suit if one of ASORT's policies leads to a constitutional violation.[11]

The Plaintiffs dispute the Defendants' characterization of ASORT and contend that Judge McHargh was correct to conclude that ASORT is subject to suit as an unincorporated association. *See* Fed. R. Civ. P. 17(b)(3)(A) ("[A] partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws."); (*see also* R&R at 11.)  The Plaintiffs offer a number of reasons in support of this assertion, most straightforwardly that ASORT cannot be said to be a part of any particular municipal or state agency and that ASORT must be *something*.  (*Cf.* R&R at 14 ("ASORT does not contend that it is a subdivision of a governmental agency or that it is itself a police department.").)

## A. Analysis

The implication that follows from ASORT's arguments – that the Plaintiffs have no recourse if ASORT's policies and procedures have proximately caused the deprivation of their constitutional rights – is a radical one.  ASORT's attempt to minimize this contention by way of analogy to a municipal police department misses the point.  A suit against that police department is simply a suit against the municipality, because a tort "by the police department" is actually a tort by the municipality.  In contrast, ASORT appears to contend that citizens who are subjected to a tort "by ASORT" have no identifiable recourse.

The Defendants' contention is particularly troubling because ASORT was formed by a private organization.  The suggestion that a private social organization could form a SWAT-type team that

---

[11] The Court has considered the possibility that a home department should be understood to "adopt" ASORT policies whenever its officers are deployed by ASORT.  The municipal defendants specifically declaim that they have designated any policymaking authority to ASORT, however.  (*See* Doc. 72-1 ("Mansfield MSJ") at 35 ("[T]here is no showing a final policymaker of Mansfield directed any of the actions on the raid that night . . . .").)

would be immune from suit certainly goes against the original intent behind § 1983, which was enacted to allow recourse against a private "law enforcement" entity whose policies, practices, and procedures deprived citizens of their civil rights.  *See Gay-Straight Alliance v. Sch. Bd.*, 477 F. Supp. 2d 1246, 1250 (S.D. Fla. 2007) (discussing the history of § 1983); *cf. Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 637 (6th Cir. 2005) ("[W]hen the state delegates a power traditionally reserved to it alone - the police power - to private actors in order that they may provide police services to institutions that need it, a plaintiff's ability to claim relief under § 1983 [for abuses of that power] should be unaffected.'" (citations omitted)).[12]

ASORT's claim that it is not subject to suit as an "unincorporated association" because it is a "government unit" is based upon a mistaken understanding of Rule 17 and is not well-taken: ASORT is governed by a *private* entity, and it appears that no municipality exercises any control over ASORT or its activities.  ASORT meets the definition of an unincorporated association under Rule 17(b)(3)(A) and is subject to suit as such.  So, too, although ASORT contends various forms of immunity under Ohio law, no provision of state law alters this conclusion.[13]  The Court explains this analysis below.

### 1.  Whether ASORT is a "Government Unit"

As previously explained, ASORT contends that it is not subject to suit because it is a "government unit."  (ASORT Obj. at 2 (quoting *Dean v. Barber*, 951 F.2d 1210, 1215 n.4 (11th Cir. 1992).)  To evaluate this contention, the Court must begin by considering the meaning of the term "government unit."  It is not found within the Federal Rules, but is, rather, a term employed by the Eleventh Circuit to explain that a state or municipal entity otherwise not amendable to suit is not made

---

[12] The Court does not intend to imply any other similarity between ASORT and the organization that led to the passage of § 1983.

[13] To be precise, as explained below, *either* ASORT is subject to suit under Rule 17(b)(3) because it is subject to suit under Ohio law *or* ASORT is subject to suit under Rule 17(b)(3)(A) because it is not.

17

subject to suit in that circuit through the operation of Rule 17(b)(3)(A).  *See id*.  In particular, the Eleventh Circuit has reasoned that only private parties can be unincorporated associations within the meaning of Rule 17(b)(3)(A).  *See Dean*, 951 F.2d at 1215 n4; *but see North Carolina League of Municipalities v. Clarendon Nat'l Ins. Co.*, 733 F. Supp. 1009 (E.D.N.C. 1990) ("Plaintiff . . . is an unincorporated association of various units of local government within North Carolina . . . .").

The problem for ASORT, even assuming that the Sixth Circuit would follow the Eleventh on this issue, is that ASORT is not a "government unit[], subdivision[,] or agenc[y]."  ASORT is governed by a *private* organization, and, to the extent there is evidence in the record that the leader of ASORT reports to any authority higher than himself for purposes of setting ASORT's policy, practices, or procedures, that authority is vested in this same *private* organization.  This alone would seem to establish that ASORT is not a "government unit[], subdivision[,] or agenc[y]."

Although ASORT points this Court to an Ohio statute that allows municipalities to form multijurisdictional police task forces, that statute does not somehow transform ASORT into a unit of government.  The relevant statute, which authorizes municipalities to "allow [their] police officers to work in multijurisdictional . . . task forces," provides in full:

> The legislative authority of any municipal corporation, in order to obtain police protection or to obtain additional police protection, or to allow its police officers to work in multijurisdictional drug, gang, or career criminal task forces . . . may enter into contracts . . . for services of police departments or the use of police equipment or for the interchange of services of police departments or police equipment within the several territories of the contracting subdivisions.

O.R.C. § 737.04.  This statute does not address the public or private character of the tasks forces themselves, however.  The agreement between the municipal defendants in this case, conspicuously absent from ASORT's briefing, emphasizes this:

> [T]he law enforcement agencies of Richland County agree to be called upon to send available units to assist in emergency calls for service in the other Richland County law enforcement jurisdictions, and all law enforcement agencies request immediate assistance through 911/ or Mansfield, Shelby, Ontario, and Lexington dispatch if any dispatching agency is unable to reach the affected agency's contact points.  In the event an agency

18

receives an emergency call for service for another agency's jurisdiction and can't reach the agency's contact point, that agency shall notify the closest unit(s) available to respond to the emergency call for service.  The dispatching agency shall continue to try to contact the affected agency jurisdiction until that agency is notified and responds and/or handles all follow-up investigation.

All law enforcement agencies of Richland County also agree to send specialized unit [sic], (e.g., <u>Allied Special Response Team members</u>, K-9 Officers, Dive Team members) when available, to assist with emergency calls for service.  Agencies may call for mutual aid for other calls as agreed upon at the time of calls.

(Doc. 111-6 at 1) (emphasis added).  While this agreement provides that the various municipalities in Richland County will allow members of ASORT to participate in ASORT when called, it does not describe the creation of a joint task force within the meaning of § 737.04 and does not describe ASORT as a unit of government.[14]

ASORT also seems to argue that it is a government entity because it is performing a traditional municipal function, but this is exactly wrong: that ASORT is performing a traditional municipal function is what makes it *subject* to suit under § 1983, not what makes it *immune* from it.  *See Romanski*, 428 F.3d at 637 ("[W]hen the state delegates a power traditionally reserved to it alone - the police power - to private actors in order that they may provide police services to institutions that need it, a plaintiff's ability to claim relief under § 1983 [for abuses of that power] should be unaffected.'" (citations omitted)).  It is true, of course, that the members of ASORT are themselves public officials who receive their equipment and salaries from local municipalities, but this does not automatically make ASORT a part of those municipalities.  As the Eighth Circuit explained in an analogous context:

the [defendant entity] was not created by the Constitution or by any statute . . . and . . . it is not 'the State' or an 'agency of the State' as are agencies like the . . . Highway Department, or the . . . Game & Fish Commission . . . .  Rather, the [defendant is]

---

[14] If contracting municipalities *had* formed a public task force, the contracting municipalities would presumably be exposed to liability to the extent they have "contracted" for the use of personnel or equipment within their jurisdiction – i.e., the task force members would become contract employees of the jurisdiction or jurisdictions seeking their services.  Precisely which municipality or municipalities would be subject to liability if such a task force proximately caused the deprivation of a constitutional right is an important question, but one that is reserved for another case.

established and supported by local school systems . . . on a voluntary basis.  Thus, it is
not immune from suit.

*Wright v. Arkansas Activities Ass'n*, 501 F.2d 25, 27 (8th Cir. 1974) (quoting the district court)).  This

same distinction applies here: that ASORT is supported by municipalities does not make it a part of

those municipalities.[15]

In sum, the Court concludes that, because ASORT is formed and governed by a private

organization, it is not a government unit, subdivision, or agency.  Whatever the reach of the Eleventh

Circuit's reasoning in *Dean*, it does not extend to an entity such as ASORT, which is not part of a state,

municipality, or group of municipalities.

### 2.  Whether ASORT is an Unincorporated Association Under Rule 17(b)(3)(A)

Given that ASORT is not a government unit, the Court must still define what, precisely, it might

be.  The Plaintiff suggests, and the R&R found, that ASORT is an "unincorporated association" under

Rule 17(b)(3)(A).  This Court agrees.

Although the term "unincorporated association" is not defined in the Federal Rules, the

"Supreme Court has defined an unincorporated association as 'a body of persons united without a

charter, but upon the methods and forms used by incorporated bodies for the prosecution of some

common enterprise.'" *Hazel v. Beta Omicron Chptr. of Sigma Nu Fraternity House Corp.*, Case No.

4:08cv46, 2009 U.S. Dist. LEXIS 19878, at *6-7 (E.D. Tenn. Mar. 12, 2009) (citations omitted).  It has

been said that "voluntary and knowing membership is the hallmark of" such an association.  *Boynton v.*

*Headwaters, Inc.*, 252 F.R.D. 397, 401 (W.D. Tenn. 2008).

As Judge McHargh explained, this definition is apt here:

---

[15] Similarly, that ASORT members are guided by certain municipal policies even when
performing a mission for ASORT, does not make ASORT itself in some way governed by
municipalities.  The record seems to indicate the opposite: ASORT operates in a manner that appears
fully autonomous from any official municipal supervision.

In the case before this court, the formation and purpose of ASORT, and the structure and composition of ASORT and its teams, was not "left to chance."  A structure and manual were put into place to govern the composition and procedures of ASORT and its teams. Similarly, the decision to deploy ASORT to serve the search warrant, and the composition, role, and procedures of the ASORT team which served the warrant were not random events, but deliberate choices, guided by ASORT policies.  The ASORT team which served the warrant was a pre-existing group (with two additions from the other ASORT team), organized in advance for the very purpose of serving warrants, not a random group of police officers from different jurisdictions spontaneously composed for mutual assistance, for example, to respond to an unexpected disaster or riot.

(R&R at 24) (internal citations omitted).  ASORT itself notes that it "was formed by [a private entity] in order to respond to tactical operations and high risk situations" and that membership in ASORT "is purely voluntary."  (Doc. 70-1 ("ASORT MSJ") at 1.)  In other words, ASORT is "a body of persons united without a charter," each of whom is a "voluntary and knowing" member.  *See Boynton*, 252 F.R.D. at 401.[16]  Indeed, ASORT all but concedes that it meets this definition: it simply argues that it should be considered a government unit and that government units are by definition not unincorporated associations.[17]  As discussed above, ASORT is not a government unit and there are no grounds to concluded that it is; ASORT, rather, is an unincorporated association.[18]

---

[16] ASORT argues "that if the incident in question involved an impromptu, collective response from various police departments, there would be no capacity to sue the collective [, and ASORT's] cooperative configuration does not present a situation so different as to apply Fed.R.Civ.P. 17(b)." (Doc. 126 ("ASORT Obj.") at 3.)  This is incorrect.  First, it is difficult to see how any ad hoc group could ever be subject to suit under Rule 17(b)(3)(A), because "voluntary and knowing membership is the hallmark of an unincorporated association."  *Boynton*, 252 F.R.D. at 401.  Second, such a group would have been formed by municipalities, not a private organization.  Finally, at least some of the municipalities in such a hypothetical would be liable to the extent that the policies of those municipalities or that task force proximately caused a constitutional violation.  *See Neace v. Perry Twp.*, No. 04cv545, 2006 U.S. Dist. LEXIS 65678, at *32-33 (N.D. Ohio Sept. 14, 2006).

[17] This Court adopts, as well, Judge McHargh's well-reasoned departure from those cases holding that intergovernmental task forces may only be sued when there is some specific grant of statutory authority from the relevant state.  *Contra Harris v. City of Hammond*, Case No. 07-3890, 2008 U.S. Dist. LEXIS 110881, at *7 (E.D. La. Sept. 30, 2008) ("[T]here are several cases relating to intergovernmental drug task forces, which stand for the general proposition that a plaintiff must point to some grant of statutory authority to show that such task forces may be sued." (collecting cases)). Although the disposition of those cases may well have been correct on the facts presented there, to the extent that those cases could be read to create an exception to Rule 17(b)(3)(A) whenever an entity

### 3.  Ohio Law Does Not Immunize ASORT from Suit in Federal Court

ASORT contends that, if it is an unincorporated association, Ohio law acts to immunize ASORT from suit.  While Ohio law allows suits against unincorporated associations, *see* O.R.C. §1745,  ASORT contends that it is impermissible to sue both an unincorporated association and its members under that law.[19]   There are three reasons why this argument is not well-taken.   First, state procedural law ordinarily does not govern the right to sue in federal court.  *Solectron United States, Inc. v. FedEx Ground Package Sys.*, 520 F. Supp. 2d 904, 910 (W.D. Tenn. 2007) ("[T]he right to sue in federal court is different from the right to sue in state court, and the [right to sue in federal court] is governed by federal [procedural law] rather than state law." (quoting *Long v. Richardson*, 525 F.2d 74, 79 (6th Cir. 1975))).   Even if the courts of Ohio were to force state litigants to choose between suits against an unincorporated association and its members in all cases, it is not clear that such a rule would have any force in federal court.

Second, it does not appear that Ohio procedural law bars a plaintiff from bringing suit against both an unincorporated association and its members as ASORT contends.  The statute itself certainly contains no such express limitation.  It is unlikely, moreover, that the dicta in the 1961 Ohio Supreme Court case upon which ASORT relies for this proposition, *Lyons v. American Legion Post Realty Co.*,

---

refers to itself as an intergovernmental task force, regardless of the underlying characteristics of that entity, such a reading is unsupportable.

[18] ASORT does not dispute that unincorporated associations are amenable to suit under § 1983 when they engage in state action.  *See Jund v. Hempstead*, 941 F.2d 1271, 1279 (2d Cir. 1991) ("The Supreme Court has repeatedly recognized that unincorporated associations may be held liable . . . . [w]e find no barrier to application of [that] reasoning . . . in the context of a section 1983 claim."); *see also Mark v. Borough of Hatboro*, 51 F.3d 1137, 1144 (3d Cir. 1995) (collecting cases in which volunteer fire associations, some of which are unincorporated, have been held liable under § 1983 when they act under color of law).

[19] ASORT contends that the definition of "unincorporated association" in O.R.C. § 1745 mirrors that of "unincorporated association" in Rule 17(b)(3)(A).  The Court assumes, without deciding, that this is correct.

could override the plain reading of the statute.  The question before the court in *Lyons* was whether O.R.C. § 1745.01 abrogated the right to sue individual members of an unincorporated association, a question that court answered in the negative: "[w]e think the new statutes are no more than cumulative and do not abrogate the right to sue the members of the associations if the suitor chooses to proceed in that way."  *Lyons v. American Legion Post Realty Co.*, 175 N.E.2d 733, 736 (Ohio 1961).  The 1961 court also wrote, however, that "[w]here a statute gives a new remedy without impairing or denying one already known to the law, the rule is, to consider it as cumulative, allowing either the new <u>or</u> the old remedy to be pursued at the option of the party seeking redress."  *Id*. at 735 (emphasis added) (quotation marks and citation omitted).  There was no particular reason for the *Lyons* court to consider the question of whether the remedies where mutually exclusive, however, since the unincorporated association was not a named defendant in that case.  It does not seem, moreover, that any court has ever read the *Lyons* dicta as does ASORT.  Subsequent Ohio courts, in fact, have allowed plaintiffs to sue both an unincorporated association and its members.  *See East Canton Educ. Ass'n v. McIntosh*, Case No. 96-CA-0293, 1997 Ohio App. LEXIS 3957, at *37 (Ohio Ct. App. Aug. 18, 1997); *Recknagel vs. Bd. of Managers of Edenwood Condominium Owners Association*, No. 1736, 1983 Ohio App. LEXIS 14099, at *1 (Ohio Ct. App. May 9, 1983).

Finally, to the extent that the dicta in *Lyons* might require an election of remedies in some circumstances, it would not do so on these facts, where the basis of liability against the unincorporated association is different from the basis of liability against the unincorporated association's members. ASORT is only liable to the extent that it, *as distinct from its individual members*, proximately caused the deprivation of a constitutional right.  *See Petty*, 478 F.3d at 349; *Austin*, 195 F.3d at 728.  The individual members of ASORT, for their part, are only liable to the extent that they, *as distinct from ASORT itself*, proximately caused the deprivation of a clearly established constitutional right.  *See Petty*,

478 F.3d at 349; *Champion*, 380 F.3d at 901.  Conversely, *Lyons* involved a situation in which the basis for liability against the unincorporated association and its members was identical.

For each of these three reasons, the argument that *Lyons* acts to immunize ASORT from suit is not well-taken.

### C.  ASORT is Subject to Suit as an Unincorporated Association

In sum, the Court agrees with Judge McHargh that ASORT is subject to suit as an unincorporated association and **<u>DENIES</u>** ASORT's Motion for Summary Judgment (Doc. 70) to the extent that it is based on the argument that ASORT is not *sui juris*.  ASORT is not a government entity, meets the definition of an unincorporated association under Rule 17(b)(3)(A), and is not somehow shielded from suit by Ohio law.  Whether ASORT is actually liable in this action, of course, will depend upon whether it proximately caused a violation of a constitutional right.  *See Petty*, 478 F.3d at 349; *Austin*, 195 F.3d at 728.

### V.  EVENTS GIVING RISE TO THE CURRENT DISPUTE

In 2006, METRICH, a law enforcement task force in Richland County, Ohio, conducted an investigation into the activities of two individuals, Myron Keith Bowles, Jr. ("Keith Bowles") and Michael McCoy ("McCoy").  (Doc. 80-4 ("Blust Decl.") at 2.)  During the course of that investigation, METRICH detectives obtained information from confidential informants indicating that Keith Bowles and McCoy were selling crack cocaine from a number of locations, including a residence located at 325 Greenlawn Avenue in Mansfield, Ohio.  (*Id.*)

In April 2006, Keith Bowles placed a call to Mansfield police officers to notify them of the presence of a firearm at 325 Greenlawn.  (Doc. 66 ("Bowles Dep.") at 32:4-10.)  He had discovered that his father, Myron Bowles, Sr., was hiding a handgun in the residence, and Keith Bowles felt threatened by the presence of a gun.  (*Id.* at 29:22-32:10).  The police officers responded and removed the handgun from the residence.  (*Id.* at 32:4-10.)

24

In May 2006, METRICH officials conducted a controlled drug buy from Keith Bowles at the Greenlawn address.

On or about September 7, 2006, informants made a controlled drug buy from McCoy at 242 East First Street.  (R&R at 6.)  The informant advised that McCoy was "possibly residing at a residence on Greenlawn Avenue."  (*Id.*)  On September 25, 2006, a tipster said McCoy used both 242 East First Street and an unknown address on Greenlawn to distribute narcotics.  (*Id.*)

On October 9, 2006, METRICH detectives conducted surveillance of 325 Greenlawn.  (*Id.*)  During this surveillance, officers observed McCoy, along with several other African American males, on the front porch of the residence.  While Detective Stephen Blust, one of the METRICH detectives investigating Keith Bowles and McCoy, testified initially that he and Detective Perry Wheeler observed McCoy, he later indicated that he was uncertain as to which officer observed McCoy at the residence.  (Doc. 88 ("Blust Dep.") at 28:9-24; 29:5-14.)  It is unclear what time of day McCoy was observed.  (R&R at 8.)

### a.  The October 9, 2006 Search Warrant

On October 9, 2006, Detective Blust applied for a search warrant to search the 325 Greenlawn Avenue residence for drugs and drug paraphernalia.  His affidavit was based on information obtained from confidential informants, including numerous controlled drug buys made from Keith Bowles and McCoy.  (Doc. 111-1 ("Search Warrant").)  Detective Blust stated that:

- On May 4, 2006, a confidential informant purchased crack cocaine from Keith Bowles at 325 Greenlawn Avenue, Mansfield, Ohio;
- On May 5, 2006, a confidential informant purchased crack cocaine from Keith Bowles at 177 Lexington Avenue, Mansfield, Ohio;
- On June 27, 2006, a confidential informant provided information that McCoy "was involved in selling crack cocaine from an unknown address on Greenlawn Ave. Mansfield, Richland County, Ohio";
- On or about September 7, 2006, a confidential informant purchased crack cocaine from  McCoy at 242 East First Street, Mansfield, Ohio;
- On or about September 20, 2006, a confidential informant stated that McCoy offered to sell $50.00 worth of crack cocaine to the informant and that "McCoy instructed

them to call him when they arrived at Greenlawn Ave., Mansfield, Richland County, Ohio, and he would then instruct them to come to a specific address.";

- On September 21, 2006, METRICH received information from a concerned citizen that McCoy was selling crack cocaine from "242 East First Street and/or an unknown address on Greenlawn Ave. Mansfield, Richland County, Ohio.  According to the source McCoy was using both residences to distribute narcotics.";

- On October 9, 2006, METRICH received information from a confidential informant that McCoy was selling crack cocaine from a residence on the North side of Greenlawn Avenue which "is almost the last house before Bowers Ave.";[20] and

- Also on October 9, 2006, METRICH officers conducted surveillance of activity at 325 Greenlawn Avenue and witnessed McCoy on the front porch of the residence along with several other black males.

(*Id*. at 9-11.)

The warrant required the officers to "knock and announce" their presence and authorized a nighttime entry.  (B&R at 6.)  Detective Blust requested a nighttime search warrant on the basis that: (1) drugs are easily concealed and destroyed; and (2) the "cover of darkness will allow for a swift entry into the residence which will ensure the safety of both officers and citizens."  (*Id*. at 11.)  It is undisputed that no weapons were specifically sought by the warrant.

### b.  ASORT's Involvement

METRICH officers contacted ASORT to request assistance in the execution of the warrant.  (Blust Decl at ¶ 9.)  The parties suggest that Blust made the decision to contact ASORT, but neither party has pointed this Court to record evidence resolving this issue.  The sole explanation offered for involving ASORT appears in a declaration attached to the City of Mansfield and Stephen Blust's Motion for Summary Judgment.  (*Id*.)  ("METRICH requested that ASORT conduct the entry into the home because of the potential threat of firearms in the home.")  The request for ASORT assistance was made to Sergeant David Mack, who became the ASORT Team Leader responsible for execution of the search warrant.  (Doc. 80-5 ("Mack Decl") at ¶¶ 2, 5.)  Captain Lance Combs was the Commander of ASORT at the time of the raid.  (*See* R&R at 8.)  Captain Combs stated that he was not familiar with the

---

[20] Bowles testified that her residence – 325 Greenlawn Avenue – is on the north side of the street.  (Bowles Dep. 58:25-59:4.)

execution of the warrant at 325 Greenlawn and had no personal involvement in the operational plan. (Doc. 90 ("Combs Dep.") at 80:14-25.)

Sergeant Michael Bammann prepared the Operational Plan ("the Plan") for the ASORT entry and search.  (Doc. 133 ("M. Bammann Dep.") at 19:13-20:1.)[21]  In the Plan, Sergeant Bammann indicated:

> This is a drug related search warrant obtained after making buys of crack from Myron Bowles.  Buys were also made from Michael McCoy at other locations although we believe he is staying at the Greenlawn Residence.
>
> - Myron Bowles has a minimal criminal record
> - Michael McCoy has an extensive record for drug possession & trafficking
>
> Unknown if anyone else is staying there and no mention of weapons although we should always expect to encounter them.  Patrol has removed guns from the residence in the past.

(Doc. 80-7 ("Operational Plan") at 5.)

As set forth in Team Leader Mack's After Action Report, briefing regarding the raid took place on October 10, 2006 at 5:00 a.m. (Mack Decl. at 5.).  Detective Blust drove Mack past the Greenlawn residence so that they could determine the best approach for the team.  (*Id.*)  Upon arriving at the briefing site, Mack received a copy of the "raid packet."  (*Id.*)  Sergeant Bammann reviewed the entire raid packet with the ASORT team and assigned detectives to perimeter positions.  (*Id.*)  Team Leader

---

[21] Plaintiff incorrectly states that the Operational Plan was created by Defendant Mack.  To the contrary, Sergeant Michael Bammann testified:

Q.    Exhibit 11 is the operational plan for 325 Greenlawn. Who wrote Exhibit 11?

A.    It's my handwriting.

Q.    And what is an operational plan?

A.    The operational plan is basically an outline of what we were going to do for that particular operation.

(M. Bammann Dep. at 19:13-19.)

Mack then "briefed the entire raid to all parties involved."  (*Id.*)  After briefing was complete, the unit deployed to the staging area, just short of the residence.  (*Id.*)

### c.  ASORT's Knowledge of Vanessa Bowles

According to Sergeant Bammann, the team did not know that the Plaintiff, Vanessa Bowles ("Bowles"), would be present in the residence.  He specifically stated that: "The two people we thought we would encounter there[were] Myron Bowles and Michael McCoy.  Those are the two people that we had dealt with making the undercover buys there.  We had no other information."  (M. Bammann Dep. at 29:1-13.)  As the Plaintiff points out, however, she is a lifelong resident of Mansfield, Ohio, and has resided at 325 Greenlawn Avenue for thirty-four (34) years.  (Doc. 112 ("Bowles Decl.") at ¶ 2.)[22] Bowles has been in a relationship with Myron Bowles for thirty-two (32) years, and together they have two children: Bryce Bowles and Keith Bowles.  In addition, Bowles has a daughter, Rachel Reid.

In fact, in October 2006, Bowles and her son Bryce were the only people residing at the 325 Greenlawn address. (R&R at 5.)  Myron Bowles was incarcerated at that time, and Keith Bowles, along with his girlfriend, had moved out in mid-September 2006.  (*Id.*)  Bowles indicated that her son Keith still had a key, however, and that she knew he still came over to the house.  (Bowles Dep. at 41:16 - 42:2.)

Bowles explained, moreover, that she has a history of cooperating with law enforcement and that she has contacted the police on several occasions.  (R&R at 5.)  Bowles specifically indicated that she

---

[22] Bowles typically worked twelve hour days during the work week.  (R&R at 4.)  She worked at McElvain Group Homes from 10:00 a.m. until 2:00 p.m., and then at the Madison Local School District between 3:00 p.m. and 11:00 p.m.  (*Id.* at 4-5.)  On October 9, 2006, Bowles did not go to work because she had a dentist appointment.  (R&R at 7.)  When she arrived home around 3:00 p.m., there were several family members at the 325 Greenlawn Avenue address, including her daughter, Rachel Reid, and her sons, Keith Bowles and Bryce Bowles.  (*Id.*)  Rachel, who works as a hairstylist, was visiting from Georgia, and during her stay at 325 Greenlawn, she had clients come to the home to get their hair done.  (*Id.*)  She was working out of the Greenlawn residence for three or four days prior to the execution of the search warrant on October 10, 2006.  (*Id.*)  Once Rachel left to return to Georgia at 10:30 p.m., however, Bowles was alone at the residence.

called the Mansfield Police Department regarding her husband, Myron, on two or three separate occasions.  (Bowles Dep. at 53:16-54:1.)[23]  Bowles asserts that she does not know whether her husband or her son Keith used or sold any drugs from the residence.  (R&R at 5.)

### d.  Execution of the Search Warrant on October 10, 2006

The execution of the warrant will be discussed in more detail below.  Broadly speaking, however, two issues have salience for purposes of this litigation.  First, Bowles alleges that the police did not knock-and-announce prior to breaking down her door with a battering ram and throwing a flash grenade into her hallway.  She concedes that she was asleep when the police arrived, but argues that she is not a heavy sleeper and that her bedroom is only a few yards from the front door.  Second, Bowles alleges that law enforcement officials used excessive force on her when they held her face down, handcuffed, and at gunpoint for five minutes.

## VI. PLAINTIFF'S ABANDONED CLAIM

Before Judge McHargh, the Plaintiff presented a claim that she does not maintain before this Court, that Defendant Blust acted with reckless disregard for the truth when he obtained the warrant in this action.  As the R&R explained:

> The plaintiff contends that Blust should be denied qualified immunity because he violated her Fourth Amendment right to be free from illegal search and seizure.  (Doc. 110, at 49-53.) . . . Bowles points out that Blust was the investigator, case agent and affiant for the search.  (Doc. 110, at 50.)  Bowles argues that, although Blust averred in the affidavit supporting the search warrant that officers observed McCoy at the Bowles residence (325 Greenlawn) on October 9, he could not recall who actually saw McCoy there on that day.  Bowles also asserts that the defendants "haven't produced any records confirming the allegations made in the search warrant."  *Id.*

> Bowles states that Blust "had a duty to discover relevant information describing the target residence and to present such information to the judge asked to sign each search warrant and to ASORT before proceeding with the mission."  (Doc. 110, at 51.) . . .

---

[23] Myron has been arrested on several occasions and was charged with possession of crack cocaine in the past. (Bowles Dep. at 35:3-13; 36:12-16.)  Bowles explained that she relied on police, probation, and parole officers to intervene when she felt that Myron was endangering himself through the use of drugs. (Bowles R&R at 5.)

An officer may be liable under Section 1983 for making material false statements either knowingly, or in reckless disregard for the truth, to establish probable cause for a warrant. *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003); *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000). "To overcome an officer's entitlement to qualified immunity, however, a plaintiff must establish: (1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." *Vakilian*, 335 F.3d at 517.

An assertion is made with reckless disregard when, viewing all the evidence, the affiant entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported. Omissions are made with reckless disregard if an officer withholds a fact that any reasonable person would have known is the kind of thing the judge would wish to know. *Peet v. City of Detroit*, 502 F.3d 557, 570 n.3 (quoting *Wilson*, 212 F.3d at 788). . . .

Here, the issue is the presence (or not) of the person sought. Blust argues that he "collected evidence – including a controlled drug buy at the 325 Greenlawn home – that Myron Bowles Jr. ["Keith"] was selling drugs from that home, and that both Myron Bowles [presumably, "Keith" again] and McCoy were trafficking in crack cocaine." (Doc. 80, at 15, citing DX C, Blust decl., at ¶¶ 3-4.) He claims that officers observed McCoy visiting the Greenlawn location on the day the search warrant was sought. Id. at 15, citing DX C, Blust decl., at ¶ 5. Thus, Blust believed that there was probable cause to seek the warrant, and presented his affidavit and intelligence to the state judge, who issued a night-time search warrant to conduct the search for drugs. *Id*. at 15-16, citing DX C, Blust decl., at ¶¶ 6, 8.)

Bowles characterizes the facts underlying Blust's sworn affidavit in support of the warrant application as "false," and contends that he acted with a "reckless disregard for the truth." (Doc. 110, at 52.) For example, Bowles argues that, although "Blust thought someone had seen Mr. McCoy and African-American males on the front porch, surveillance of the residence would have disclosed the presence of African-American men who were not Mr. McCoy." *Id*. The court is unclear as to how Bowles believes that the presence of other "African-American men who were not Mr. McCoy" precludes the presence of McCoy himself as well.

Similarly, the fact that "McCoy actually lived in and used other locations to deal crack and cocaine" does not rule out the possibility that McCoy used 325 Greenlawn also, particularly in light of the statement in the affidavit that McCoy had been witnessed at 325 "on numerous occasions." (Doc. 80, DX C, at [13], Affidavit to Search, ¶ 18.)

Bowles points out that McCoy was not found at the house on the morning of October 10, 2006. (Doc. 110, at 52.) This does not render the sighting of McCoy on the previous day "false," necessarily. It goes without saying that a person can be at a certain place at one point during a day, and then elsewhere later that same day. . . .

> To issue the warrant, the state judge found the existence of "probable cause to believe" that the evidence would be found at 325 Greenlawn.  As in any case, the belief may turn out to be mistaken, or the evidence may be moved in the time between the events supporting probable cause and the actual execution of the warrant.  Neither eventuality renders Blust's application for the warrant unreasonable or unconstitutional.

(R&R at 47-51.)

The Plaintiff does not object to the R&R's conclusion that Blust is entitled to qualified immunity in connection with his decision to seek and obtain a warrant.  Accordingly, the Plaintiff has waived the right to review by this Court or any other.  *See Thomas*, 474 U.S. at 149-52; *Crum*, 921 F.2d at 645 n.1; *Gonzales*, 2006 U.S. Dist. LEXIS 73370, at *3-4.  Defendant Stephan Blust's Motion for Summary Judgment (Doc. 80) is thus **GRANTED**.

## VII.    WHETHER THERE IS LIABILITY UNDER § 1983 BECAUSE LAW ENFORCEMENT OFFICIALS FAILED TO "KNOCK-AND-ANNOUNCE"

Bowles' first preserved claim is that her constitutional rights were violated when law enforcement officials failed to knock-and-announce prior to entering her residence.  The Defendants acknowledge that they were constitutionally required to knock-and-announce their presence, but contend that they did so here.

### A.  Relevant Facts

Bowles was asleep when ASORT members approached her front door at approximately 6:45 a.m.  (R&R at 9.)  Bowles contends that she did not hear the officers knock-and-announce their presence before they entered her home.  She stated that:

> I am not a heavy sleeper.  Had the officers knocked loudly and announced their presence I would have promptly exited my bed and looked through my front window to see who was at my door.  That would have taken me no more than 5 [or] 10 seconds.

(Bowles Decl. at ¶ 5.)  The Greenlawn residence has a small front porch which Bowles can see from her bedroom window.  (Bowles Dep. at 63:21-23; 67:12-16.)  Bowles' bedroom is close to the front door.  (*Id*.; *see also* Bowles 66-1 ("House Diagram").)  Bowles states that if she had seen the police on her

front steps she would have opened the door.  (Bowles Decl. at ¶ 6.)  The first noise she remembers hearing, however, was a flash-grenade detonating in her front hall.  (Bowles Dep. at 70:21-24.)[24]

Law enforcement officials assert that they performed a proper knock-and-announce prior to entering Bowles' residence.  They argue that Bowles was simply sleeping too soundly to hear them. Yet, no particular member of ASORT attests to knocking or announcing, nor do any of them attest to remember who did knock or announce.  So, too, the official report ("After Action Report" or "AAR") does not indicate that any knock and announce occurred.  (Doc. 80-5 ("AAR") ("Once we approached the residence Detective Wheeler used a ram to breach the residence and Pt. Evans threw a flashbang into the residence.").)  This notwithstanding, at least two law enforcement officials on the scene recall hearing an announcement and have testified under oath to that fact.  (*See* J. Bammann Dep. at 57:12-23; Gouge Dep. at 99:10-15.)

> The Defendants point, in particular, to the testimony of Deputy Robert Gouge:
>
> We arrived at the residence, disembarked from whatever vehicle we were using at that time.  We approached the house. The commands, "Police, search warrant" were given. Entry was made.  I believe a flash bang was used.  And I pretty much remained on the porch, front door area of the home.

(Gouge Dep. at 99:10-15.)  Gouge testified that the announcement was made "upon approaching the house."  (*Id*. at 100:11-12.)  Although he indicated that, when he personally executes a nighttime knock and announce search warrant, he typically gives the resident(s) a "few seconds" to get to the door (Gouge Dep. at 96:13-97:9), in this particular case, he testified that he could "guestimate and say maybe

---

[24] Bowles did not report hearing the police force open her door.  Given that the Defendants do not raise this issue, the Court assumes, without deciding, that the door was forced and the flash grenade was detonated simultaneously, such that a sleeping person would perceive that one sound had awoken her, rather than two.  The After Action Report indeed suggests that the door was breached and the flash bang was thrown simultaneously:  "Detective Wheeler used a ram to breach the residence and Plt. Evans threw a flashbang into the residence."  (AAR.)

60 seconds" elapsed between the beginning of announcement and entry.  (*Id*. at 102:12.)[25]  Gouge explained that the lead officer is generally the person who would announce police presence, although several officers would frequently announce simultaneously.  (*Id*. at 100:11-19.)  He further explained that typically several officers repeat the phrase.  (*Id.* at 100:17-101:4.)

The AAR indicates that ASORT Team Member Jason Bammann was the first one at the door.  (*See* AAR.)  Bammann stated that, although he did not perform the knock-and-announce, he recalls hearing "police department, search warrant, as we always yell."  (J. Bammann Dep. at 57:12-23.)  Bammann indicated that, after law enforcement officials received no response, entry was forced.  (*See id*.)  Although Jason Bammann indicated that he does take into account the amount of time a law-abiding citizen would normally take to get from one part of the house to the front door, he also stated

_____

[25] When asked how much time he gives to residents in the home at night when he executes a nighttime knock and announce, Deputy Gouge stated that:

> I don't know that I can put a specific time frame on it.  I would say, I like to use, I don't know, for lack of better terms, what I would consider a reasonable response time.  If I'm in my house, even if I'm asleep and I hear someone banging on my door loudly and I hear someone yelling, "Police, search warrant" out of it, I'm going to bolt out of my bed to the front door.  And I know <u>that's only going to take me a few seconds to get from my bed to the door.  So I kind of use that as my standard as to how much time to wait</u>.

(Gouge Dep. at 96:13-97:2 (emphasis added).)  This testimony notwithstanding, Gouge estimated that the team waited sixty seconds after announcing and before entering Bowles' home.  (Gouge Dep. at 101:25-102:12.)

The Plaintiffs note that Gouge also gave a sixty second estimation elsewhere in his deposition, in connection with a different ASORT raid.  (Plaintiff's Obj. at 5.)  The Plaintiffs assert that Gouge is less credible because he gave the same estimation in two cases, and because the Defendants concede that the knock-and-announce in the other case was only a few seconds before entry.  (*See id*.)  The Defendants react to this assertion by arguing that Gouge's deposition testimony about the other case cannot be used to call into doubt his testimony in this case, even though he gave both statements in the course of a single deposition.

Although the Defendants are incorrect, Gouge's testimony about that other case is not particularly probative because Gouge gave that 60-second estimate about an issue having nothing to do with the knock-and-announce in connection with the other search.  (*Compare* Gouge Dep. at 34:14 (containing the 60 second estimation for time law enforcement officials were in a particular location) *with* Gouge Dep.  at 27:7 (containing a 15-20 second estimation for the timeline between announcement and entry in that other case).)

that "[i]f I'm at your house in a SWAT capacity we're not dealing with a normal law-abiding citizen I would say at that point."  (*Id.* at 61:12-62:9.)

After the team successfully breached the door, "Plt. Evans threw a flashbang into the residence." (*See* AAR.)  Deputy Gouge explained that a flash bang is utilized during the execution of a search warrant "where there's a history of firearms in the residence" or where the subjects of the investigation have a history of violence.  (Gouge Dep. at 104:12-19.)  In this case, the officers knew that police had been called to the same home several months before the raid to remove a firearm. (Operational Plan at 5.)

### B.  Whether the Plaintiff Suffered the Deprivation of a Constitutional Right

#### 1.  Applicable Law

Law enforcement officers are generally required to knock and announce their presence.  *Hudson v. Michigan*, 347 U.S. 586, 590 (2006) ("The common-law principle that law enforcement officers must announce their presence and provide residents an opportunity to open the door is an ancient one." (citation omitted)); *see also United States v. Pennington*, 328 F.3d 215, 220 (6th Cir. 2003) ("[A] unanimous Supreme Court held that the Fourth Amendment prohibition on unreasonable searches and seizures includes the general rule that an officer's unannounced entry into a home, absent special circumstances, is unconstitutional." (citing *Wilson v. Arkansas*, 514 U.S. 927 (1995))).  This well-established rule protects important interests:

> including 1) reducing the potential for violence to both the police officers and the occupants of the house into which entry is sought; 2) curbing the needless destruction of private property; and 3) protecting the individual's right to privacy in his or her house.

*United States v. Dice*, 200 F.3d 978, 982 (6th Cir. 2000) (citing *United States v. Bates*, 84 F.3d 790, 794 (6th Cir. 1996)); *see also United States v. Hardin*, 106 Fed. Appx. at 444 (6th Cir. 2004) ("An integral part of the knock-and-announce rule is the requirement that officers wait a reasonable period of time

after a knock before physically forcing their way into a residence, so that the resident has the opportunity to allow peaceable entry." (quoting *Dice*, 200 F.3d at 983) (internal quotations omitted)).[26]

### 2. R&R and Objections

The R&R concludes that Bowles has failed to show that there is a disputed issue of material fact as to whether the ASORT team members properly knocked-and-announce their presence:

> The officers have testified that they knocked and announced, and after waiting an undetermined time, they forced entry. The facts as presented in Bowles' testimony do not contradict the ASORT officers' testimony that they knocked and announced. Rather, Bowles' testimony establishes that she was asleep prior to the entry, and thus cannot support any inference as to whether the team knocked and announced or not. Bowles relies on pure conjecture to argue that the officers did not knock, or did not wait long enough:
>
> > 5. I am not a heavy sleeper. Had the officers knocked loudly and announced their presence I would have promptly exited my bed and looked through my front window to see who was at my door. That would have taken me no more than 5 10 seconds.
> >
> > 6. If I had seen the police on my front steps I would have opened the door.

(R&R at 37-38) (citations omitted).

Bowles objects to the R&R's conclusion and asserts that there is a genuine issue of material fact as to whether the Defendants performed a proper knock-and-announce, given her testimony that if the Defendants had done so, she would have awoken and allowed them in. She argues:

> The Magistrate [Judge] ignored the Plaintiff's contention that she is a light sleeper and instead held, "Bowles' testimony establishes that she was asleep prior to the entry, and thus cannot support any inference as to whether the team knocked and announced or not." Vanessa Bowles is certainly able to provide a lay opinion as to her sleeping habits and her propensity to wake up when persons enter her front door. *U.S. v. Stroup*, 411 F.2d 749 (9th Cir. 1969) (witness testified that he was a light sleeper and would have awakened had a car started outside his window). She has lived in the house for thirty-four years. The front door is literally on the other side of her bedroom wall.

---

[26] There are well-established exceptions to this general rule, however, no party argues that one of those exceptions applies to this case.

(Plaintiff's Obj. at 7) (record citations omitted).  Bowles also points the Court to a case in which Judge Christopher A. Boyko of this Court found that whether a sleeping plaintiff would have awoken presents an issue of fact for the jury.  *See DePaolo v. Brunswick Hills Police Dep't,* Case No. 1:05cv944, 2007 U.S. Dist. LEXIS 51649, at *19 (N.D. Ohio July 17, 2007).

### 3. Analysis

Judge Boyko's reasoning is not without its appeal.  One purpose of the knock-and-announce rule is to give residents "the opportunity to allow peaceable entry."  *United States v. Hardin*, 106 Fed. Appx. 442, 444  (quoting *United States v. Dice*, 200 F.3d 978, 983 (6th Cir. 2000)); *accord United States v. Buchanan*, 78 Fed. Appx. 933, 935 (5th Cir. 2003) ("[T]he knock-and-announce rule . . . allow[s] residents of a home an opportunity to respond to and cooperate with the police presence in lieu of having to face an unexpected and threatening intrusion.").  Against this backdrop, it does not seem unreasonable to find testimony from an individual that she is a light sleeper to be probative of whether the police announced their presence in a manner that was reasonably calculated to awaken sleeping individuals.

As the R&R points out, however, subsequent to *DePaolo*, the Sixth Circuit explained that a reasonable jury may not draw inferences from what a Plaintiff does *not* observe, even where the circumstances arguably suggest that an event would have been perceived if it occurred.  *See Chappell v. City of Cleveland*, 585 F.3d 901, 914 (6th Cir. 2009).  In *Chappell*, the estate of a teenager shot and killed by police officers sued the officers involved in the shooting and a municipal defendant, asserting that the officers had failed to identify themselves properly prior to the shooting and that the shooting would never have occurred had the teenager understood that he was facing law enforcement.  *See id*. The officials involved in the fatal shooting testified that they had identified themselves, whereas three witnesses, arguably in a position to hear such an announcement, testified that they had heard no such announcement.  *See id*.  The Sixth Circuit found the officers' motion to dismiss on the grounds of qualified immunity well-taken, holding that "three witnesses' failure to hear the 'Cleveland Police'

announcements does not refute the detectives' testimony that they in fact made several such announcements; it establishes only that the witnesses didn't hear the announcements." *Id*. Judge McHargh relied upon *Chappell* in reaching his conclusion that Bowles' testimony was insufficient to rebut the officers' sworn statements that a knock-and-announce, with a reasonable response time, occurred. The Court is compelled to agree.

Accordingly, the Court adopts the reasoning of the R&R, and finds that Bowles has failed to show the existence of a genuine issue of material fact as to whether the police violated the constitutional obligation to knock-and-announce their presence. Defendants' Motions for Summary Judgment (Docs. 78-82) are **GRANTED** as to this claim.[27]

## VIII.  WHETHER THERE IS LIABILITY UNDER § 1983 BECAUSE LAW ENFORCEMENT OFFICIALS EMPLOYED EXCESSIVE FORCE

Bowles' other claim is that law enforcement officials subjected her to excessive force during the raid on her house. The Defendants deny that Bowles was subjected to excessive force. They also argue that, to the extent any constitutional violation occurred, none of the Defendants can be said to have proximately caused that violation.

---

[27] Bowles also devotes some of her briefing to the absence of records indicating whether a knock-and-announce was performed. (Plaintiff's Obj. at 9-10.) It appears that she claims: (1) that the Court should presume that records were destroyed and draw a negative inference from that fact and; (2) that because the records do not state that a knock-and-announce occurred, a reasonable jury could conclude that a knock-and-announce did not.

The Plaintiff's first argument is not well-taken because, as explained by Judge McHargh, she has failed to demonstrate that records existed in the first instance. (R&R at 40-43.) Failing to keep records is not the same as destroying them, and Bowles has not pointed this Court to any evidence that would allow it to conclude that any records were actually destroyed. (*See id*.)

The Plaintiff's second argument is stronger at first glance. The Court cannot conclude, however, that a reasonable jury could find that a knock-and-announce did not occur simply because the AAR does not happen to mention that a knock-and-announce occurred, in the absence of any evidence indicating whether or not AARs usually mention a knock-and-announce, particularly in the face of sworn testimony from the officers at the scene that a knock-and-announce did occur.

### A.  Relevant Facts

Bowles awoke around 6:00 am, when she heard a loud explosion.  (Bowles Dep. at 70:21-71:15.)

She jumped out of bed and ran to her bedroom door (*id.* at 72:10-73:5) where she saw flashing light, a

substantial amount of smoke, and several officers in her small hallway (*id.* at 73:6-15).  She recognized

the uniformed officers as law enforcement and recalls the officers yelling about a search warrant.  (*Id.* at

73:17-74:14.)

According to ASORT team member Jason Bammann, after the door was opened, he remembers

"John Mager[] encountering the white female in the back of the room in the hallway leading to the

bedrooms.  He was ordering her to get down and she was refusing."  (J. Bammann Dep. at 64:9-22.)[28]

It is undisputed that Bowles was somewhat confrontational with the officers.  (*Id.* at 69:1-14.)  Indeed,

Bowles admits that she said "are you serious?" and an officer responded "[y]eah, I'm serious.  Get

down."  (Bowles Dep. at 74:12-75:1.)  Bammann further stated that it was imperative that Bowles get

down and out of the way because "her position in that hallway was blocking the entire SWAT team from

going back and clearing the remaining rooms in th[e] residence."  (J. Bammann Dep. at 69:1-14.) When

Bowles failed to comply with Mager's repeated instructions to get down, Bammann "placed her on the

ground."  (*Id.* at 64:9-22.)  Bammann explains that he grabbed Bowles and "placed her face-down on the

ground to get her out of the way." (*Id.* at 71:4-13.)  He says he did not "throw her face-down" and

instead used "just as much force" as necessary to get Bowles down and detained for everyone's safety.

(*Id.* at 72:5-25.)  Bammann indicated that Bowles was already handcuffed by the time he put her on the

ground but that he was not sure who had handcuffed her.  (*Id.* at 73:14-21.)

Once Bowles was down on the ground, three or four guns were pressed against the back of her

head (R&R at 9-10; Bowles Dep. at 75:15-20), although the record does not explain which officers held

---

[28] John Mager, although listed as the "point" on the AAR, and identified by Jason Bammann as
the officer who first encountered Bowles, testified that he has no recollection of being at 325 Greenlawn
Avenue.  (Bowles 109 ("Mager Dep.") 47:4-6.)

guns to her head.  The officers then asked Bowles where McCoy was and Bowles told them she did not

know.  (*Id.* at 75:22-25.)  After approximately five minutes, Bowles heard someone say "she's alone."

(Bowles R&R at 10.)  At that point, the guns were removed from Bowles' head and she was led to the

couch where she remained handcuffed.  (*Id.*)  While she was handcuffed, Bowles claims certain officers

flicked the hair out of her eyes and someone said, "[i]sn't she cute today?"  (Bowles R&R at 10; Bowles

Dep. at 80:8-15.)

 Bowles did not sustain any physical injuries from her interaction with the police.  (*Id*. at 88:7-

89:10.)  She did indicate that she has arthritis in her knees and that her knees were bothering her.  (*Id.*)

With respect to non-physical injuries, Bowles testified that she "could have had a heart attack" and that

it was "not exactly a nice situation for anybody to go through, especially when they're by theirself and

they're already afraid."  (*Id.* at 90:9-18.)[29]

### B. Whether the Plaintiff Suffered the Deprivation of a Constitutional Right

#### 1. Applicable Law

 The governmental interest in using reasonable force to accomplish a constitutional seizure is

clear and strong.  Nevertheless, "the gratuitous use of force on a suspect who has already been subdued

and placed in handcuffs is unconstitutional."  *Bultema v. Benzie County*, 146 Fed. Appx. 28, 35 (6th Cir.

2005) (citing *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)); *see also Roberts v. Manigold*,

---

 [29] After ASORT secured the premises, Detective Blust and several other officers conducted a
search through the 325 Greenlawn Avenue residence looking for drugs and contraband.  (Blust Dep. at
52:5-10; Blust Decl. at ¶ 10.)  He indicated that he read the affidavit to Bowles and left a copy with her.
(Blust Dep. at 53:15-54:2.)  The officers found, among other things: (1) marijuana stems and seeds; (2)
rolling papers and a razor blade; (3) a marijuana smoking pipe; and (4) an at-home drug test kit for
cocaine.  (Blust Decl. at 19-20.)[29]

 As a result of the search, Bowles was charged with possession of marijuana, drug paraphernalia,
and disorderly conduct.  (Blust Decl. at ¶ 11.)  She was taken to jail and was incarcerated for
approximately four to five hours.  (Bowles Dep. at 118:21-24.)  After Bowles took a drug test, both of
the drug charges were dropped.  She pled guilty to disorderly conduct for talking back to officers (a
fourth degree misdemeanor) and paid a $50 fine.  (R&R at 11.)

240 Fed. Appx. 675, 677-78 (6th Cir. 2007) (citing Bultema, 146 Fed. Appx. at 35); *Griffith v. Coburn*, 473 F.3d 650, 658 (6th Cir. 2007); *St. John v. Hickey*, 411 F.3d 762, 774-75 (6th Cir. 2005).  It is well-established that the use of additional force on a handcuffed suspect constitutes excessive force if that suspect does not pose a safety threat, is not a flight risk, or is not somehow resisting arrest.  *See Bultema*, 146 Fed. Appx. at 35 (citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901(6th Cir. 2004)); *Greene v. Barber*, 310 F.3d 889, 898 (6th Cir. 2002); *Vaughn v. City of Lebanon*, 18 Fed. Appx. 252, 265 (6th Cir. 2001);  *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994).  So, too, "courts have recognized excessive force claims in cases where the alleged use of force did not even involve physical contact."  *Holmes v. City of Massillon*, 78 F.3d 1041, 1048 (6th Cir. 1996) (citing *Cornwell v. Dahlberg*, 963 F.2d 912, 915 (6th Cir. 1992)) (other citations omitted).  Although the Sixth Circuit does not appear to have applied these general principles to the precise fact pattern where guns are trained on a compliant citizen, the Third, Seventh, Ninth, and Tenth have, and their conclusion is uniform: "pointing guns at persons who are compliant and present no danger is a constitutional violation." *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009) (Wood, J.) (collecting cases).

Of course, it is axiomatic that officers may enter the home of suspected drug traffickers with guns drawn, *see Kelley v. McCafferty*, 283 Fed. Appx. 359, 364 (6th Cir. 2008), and may proceed to point their weapons at an individual whom they honestly, even if mistakenly, believe to be dangerous, *see id*.; *see also Baird*, 576 F.3d at 346 ("[T]he critical point: while police are not entitled to point their guns at citizens when there is no hint of danger, they are allowed to do so when there is reason to fear danger.").  On the other hand, "law enforcement officers may not point weapons at suspects [who] pose no threat" because "the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force."  *Chidester v. Utah County*, 268 Fed. Appx. 718, 728-29 (10th Cir. 2008) (quoting *Holland*, 268 F.3d at 1192).  In other words, as with any use of force, the threatened use of a weapon must "be predicated on at least a perceived risk of injury or danger to the officers or others,

based upon what the officers know at that time." *Id.*; *cf. Kelley*, 283 Fed. Appx. at 364 ("[P]laintiffs allege that weapons were pointed at Kelley only until she lay on the floor, which she did quickly.").[30]

### 2.  The R&R and Objections

The R&R suggests that no constitutional violation occurred:

> The "excessive force" that Bowles was subjected to appears to consist of being handcuffed and having guns "pressed against her head" for approximately five minutes while the officers determined that McCoy was not in the house, and remaining handcuffed on the couch while the officers conducted the search of the residence.  The use of the flash-bang device is not referenced on the cited pages, but is conceivably part of her excessive force claim as well. . . . The officers' actions to secure Bowles to be able to continue to carry out their valid search warrant were not unreasonable.

(R&R at 53, 59) (citations omitted).

The Plaintiff has filed a proper objection to this conclusion.  She argues that the R&R erred because it did not "address the fact that Vanessa Bowles was held on the floor with guns to her head for five minutes while handcuffed."  (Plaintiff's Obj. at 15.)[31]  She further contends that "[t]he deliberate, terrifying act of placing automatic weapons to her head for an extended period of time was completely unnecessary, excessive, and abusive."  (*Id.*)

---

[30] *Baird* and the cases on which it relies are thus distinct from the situation where an officer points his gun in a show of force to, for example "abort a potentially violent situation" – *i.e.*, pointing a gun at one individual while arresting another, *Collins v. Nagle*, 892 F.2d 489, 497 (6th Cir. 1989) (quoting *Hinojosa v. Terrell*, 834 F.2d 1223, 1231 n.10 (5th Cir. 1988), or when officers enter a house with guns drawn because they reasonably believe that they may face armed resistance, *see Kelley v. McCafferty*, 283 Fed. Appx. 359, 364.

Such actions are not subject to second-guessing after the fact.  *See Collins*, 892 F.2d at 497; *Kelley*, 283 Fed. Appx. at 364.  The reasoning in *Collins* and *Kelley*, however, does not apply when officers point a gun at a restrained individual whom no objectively reasonable officer could believe poses a continuing threat.  *See Collins*, 892 F.2d at 497.  ("[T]o subject . . . displays of force to second guessing by a jury may increase the likelihood that the officer will wait until the situation escalates further before drawing his gun, and thereby end up having to (or believing he has to) shoot to protect himself or others." (citation omitted)).

[31] Obviously, this is inaccurate.  That the R&R did not find that a violation occurred does not mean that it somehow failed to address the issue.

### 3.  Analysis

While the Court agrees with the vast majority of the well-reasoned R&R, it does not necessarily agree that no constitutional violation occurred.  As explained above, it is well-established that "pointing guns at persons who are compliant and present no danger is a constitutional violation."  *Baird*, 576 F.3d at 346.  Although the Defendants argue that this rule applies only to children (Doc. 127 at 8), they are wrong.  It does not somehow become per se reasonable to point assault rifles at handcuffed individuals on their 18th birthday:

> We note that these cases so often involve children because they are much less likely to present the police with a credible threat.  In other words, the unreasonableness of the gun-pointing is more apparent in these cases, though pointing a gun at a compliant adult in a non-threatening situation, as in this case, can also constitute excessive force.

*Baird*, 576 F.3d at 346.

There are, however, issues in this case that arguably distinguish it from *Baird*, in particular, that Bowles was charged with disorderly conduct and initially resisted the officers to at least some degree.  It may have appeared to reasonable officers, acting in a rapidly evolving and potentially dangerous circumstance, that Bowles continued to pose some threat even after she was handcuffed: the record on this point is unclear.  As explained below, however, the Court need not resolve definitively the question of whether a reasonable jury could find that a constitutional violation occurred.

### C.  The Propriety of Recovery Against Any Particular Party

Even assuming that the Plaintiff was subjected to excessive force when weapons were trained on her after she had been handcuffed, Summary Judgment in favor of the Defendants is appropriate because Bowles has failed to show that any of the entities or individuals that she sued was the proximate cause of this force.  Notably, Bowles did not sue any of the [unidentified] law enforcement officials who she alleges actually employed the excessive force upon her.  Instead, she alleged that various ASORT and municipal policies were the proximate cause of her deprivation.  As explained below, she has not presented evidence that would allow a reasonable jury to conclude that she is correct.

42

### 1.  The Individual Defendants

#### a.  R&R and Objections

The R&R summarized the Plaintiff's contentions with respect to the individual defendants,

ASORT Commander Lance Combs and ASORT Team Leader David Mack:

> Bowles states that Combs was the ASORT Commander at the time of the raid, and that
> Mack was the ASORT Team Leader for the operation. Bowles argues that the relevant
> constitutional violation involving Combs and Mack was the "unreasonable forced entry
> and . . . excessive force."  Although Combs was not at the raid, "his policies were being
> followed," and "Mack was at the raid and provided on-the-scene direction under those
> policies."  Bowles does not specify which policies are at issue.
>
> Combs and Mack respond that they did not violate any of Bowles' constitutional rights.
> Combs testified that he was not involved in the planning or execution of the search
> warrant for the Bowles residence.  Because there is "absolutely no evidence to indicate
> Capt. Combs participated in the actions at issue in this case," he argues there is no basis
> for holding him liable for any constitutional violation.
>
> As to Mack, the Shelby defendants assert there is "also no evidence to show that Sgt.
> Mack was involved in any constitutional violations which may have occurred or that Sgt.
> Mack was in any position to stop any of the purported violations."  Mack was not
> identified as being involved in Bowles' detention, and there is no indication that he was
> in any position to observe these activities.
>
> Bowles, however, relies on the policy involvement of Combs and Mack, rather than their
> personal actions during the warrant execution.  Combs was not at the raid, but "his
> policies were being followed," and "Mack was at the raid and provided on-the-scene
> direction under those policies."  Bowles does not identify the policies at issue, but refers
> the court to the "unreasonable forced entry and . . . excessive force" in her factual
> statement.

(R&R at 52-53) (citations omitted).

Because Bowles makes broad allegations, rather than pointing to specific policies or practices,

Judge McHargh concluded that there was no evidence from which a reasonable jury could conclude that

Defendant Combs or Defendant Mack was the proximate cause of any constitutional deprivation:

> The Shelby defendants point out that Bowles makes no allegations that Combs was
> personally involved in the planning or execution of the warrant operation.  Further, they
> assert that Bowles points to "absolutely no evidence that Captain Combs set any policies
> causing any inappropriate conduct with respect to the execution of the warrant," nor has
> she shown any ASORT policies which were promulgated by Combs . . . . The court
> agrees that Bowles has not demonstrated any involvement of Combs in formulating any

43

policies regarding knock-and-announce entries, the use of flash-bang devices, or the use of handcuffs or pointed weapons to restrain an individual during the execution of a search warrant.

The Shelby defendants also note that Bowles has made no allegations that Mack participated in, or observed, the force allegedly used against her. . . . again, Bowles has not demonstrated any involvement of Mack in any policies regarding knock-and-announce entries, the use of flash-bang devices, or the use of handcuffs or weapons to restrain an individual during the execution of a warrant.

Bowles has not supported her assertions that Combs and Mack were responsible for ASORT policies concerning the alleged constitutional violations.

(R&R at 53-54) (citations omitted).

Bowles has objected to the R&R's conclusions:

Combs and Mack . . . conducted [ASORT] training and Mack established the operation plan and participated in the operation while the officers engaged in actions consistent with their training and Mack's plan.

ASORT Commander Combs was not at the raid on the Bowles home but his policies as set by the ASORT training (which he directed) were being followed. ASORT Team Leader Mack was at the raid and provided on-the-scene direction under those polices and under his operation plan.  Mack claimed at his deposition that he was not present at 325 Greenlawn.  Long after the deposition Defendant Mack supplied an affidavit that stated he was indeed present at the house and attached the after-action report written by him and actually describing events at 325 Greenlawn.  Obviously if he had stated in deposition that he was present at Greenlawn more details of the event would have been available to the parties.  At any rate, it is the Plaintiff who should get the benefit of any inferences to be drawn from the difference between Mack's deposition testimony and his subsequent affidavit since a party cannot file an affidavit that contradicts his deposition in summary judgment proceedings.

Mack was present and personally participated in the constitutional violations of Ms. Bowles.  He is the one [whose] report fails to mention any knock and announce.  He is the one who did not restrain the officers from entering without a knock and announce and from using excessive force once inside.

(Plaintiff's Obj. at 21-22) (citations omitted).

44

### b.  Analysis

As Judge McHargh explained, Bowles fails to connect any particular action or policy from Combs or Mack to the alleged use of excessive force.[32]  She offers only the sweeping argument that "Combs and Mack . . . conducted [ASORT] training and Mack established the operation plan . . . while the officers engaged in actions consistent with their training and Mack's plan"  (Plaintiff's Obj. at 25.) and that that Combs and Mack "<u>presumably</u>" trained ASORT Team Members on the "use of guns on persons who are restrained" (*id*. at 18) (emphasis added).  Her argument, distilled to its essence, is that she suffered excessive force at the hands of ASORT's team members and that the training governing those team members was necessarily defective because she suffered excessive force.[33]  But that falls short of her obligation to show that Combs and/or Mack proximately caused the use of that excessive force.  *See Miller v. Calhoun County*, 408 F.3d 803, 817 n.3 (6th Cir. 2005) ("Because § 1983 liability cannot be imposed under a theory of respondeat superior, proof of personal involvement is required for a supervisor to incur personal liability.").

Accordingly, Combs' and Mack's Motions for Summary Judgment (Doc. 82) are **<u>GRANTED</u>** as to this claim.

---

[32] The Court is not entirely unsympathetic to Bowles' argument that she might have been able to present more specific information about Mack's role in this case if Mack had not claimed, incorrectly, that he had no involvement in the raid on Bowles' house.  Yet, Bowles does not ask this Court for any particular relief as a result of Mack's inaccurate testimony.  Furthermore, her general observation that all reasonable inferences must be drawn in her favor and that Mack cannot defeat summary judgment with an affidavit that is inconsistent with his deposition testimony misses the point, which is that Bowles has failed to present evidence that would allow a reasonable jury to conclude that Mack was somehow responsible for the application of excessive force against her.

[33] To the extent that Bowles appears to argue that Mack is liable on a theory of supervisory liability, this claim must fail because she has failed to show that he somehow encouraged or condoned the use of force against her.  *See Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) ("In order for liability to attach to [a supervisor] for the alleged actions of [a subordinate], Plaintiff must prove that [the Supervisor] did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on.  Plaintiff must show that [the Supervisor] otherwise encouraged or condoned the actions of [the subordinate]." (citations omitted)).

### 2.  The Entity Defendants

Bowles next argues that the entity defendants, ASORT, Mansfield, Shelby, and Ontario, are liable through the actions of ASORT Commander Combs and ASORT Team Leader Mack, both of whom she contends are policymakers for those defendants.  (*See* Plaintiff's Obj. at 15-19.)  The essential problem for Bowles, as explained above, is that she has not shown that Combs or Mack somehow caused the deprivation of a constitutional right.[34]  Accordingly, even assuming that Combs and Mack are final policymakers for purposes of establishing ASORT and municipal policy with respect to the use of force, Bowles has not shown that their policies somehow resulted in excessive force.  At most, Bowles has shown that a reasonable jury could conclude that she was subjected to excessive force,[35] which is a very different matter than showing that a reasonable jury could conclude that this force was the result of some particular policy, practice, or procedure.  Accordingly, ASORT's, Mansfield's, Shelby's, and Ontario's Motions for Summary Judgment (Docs. 78-80, 82) are **<u>GRANTED</u>** as to this claim.

### IX. STATE LAW CLAIMS

Judge McHargh has recommended that this Court dismiss Bowles' state law claims for lack of jurisdiction:

> The remaining claims (assault and battery, negligent infliction of emotional distress, and intentional infliction of emotional distress) are based on Ohio law.  Since the federal cause of action should be dismissed, the state causes of action should be dismissed for lack of jurisdiction.  This principle may be raised sua sponte by the court.

(R&R at 60) (citations omitted).

Bowles has objected to this portion of the R&R on the basis that Judge McHargh incorrectly recommended in favor of summary judgment for the Defendants on her federal claims.  (Plaintiff's Obj.

---

[34] The Court observes, as well, that there is no evidence that ASORT, as distinct from its members, somehow proximately caused  the use of excessive force on Bowles.

[35] As explained above, the Court reaches no definitive conclusion on this point.

at 22-23.)  As explained above, however, Bowles has not presented a viable federal claim.  Accordingly, the Court **DISMISSES** Bowles' state law claims for lack of jurisdiction.

## X.  CONCLUSION

For the aforementioned reasons, the Court **OVERRULES** the Parties' objections to the R&R, and **ADOPTS** the R&R, as modified above.  Accordingly, the Defendants' Motions for Summary Judgment (Docs. 78-80, 82) are **GRANTED**, except to the extent that Defendant ASORT had moved for summary judgment on the grounds that it is not *sui juris* (Doc. 81), a motion that is **DENIED**.[36]

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 30, 2010**

---

[36] All substantive claims against ASORT, however, are dismissed.

47